## THE ROSEWAY.

Circuit Court of Appeals, Second Circuit.
June 17, 1929.

No. 358.

Emery & Pyne, of New York City (Warner Pyne and Vincent A. Catoggio, Jr., both of New York City, of counsel), for appellant.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge. The appellant supplied foodstuffs to the vessel Roseway between April 28, 1925, and February 20, 1926, and a maritime lien for the value thereof is asserted. The Roseway at the time was owned by the appellant, Quinn, of Cambridge, Mass. Quinn was the cashier of a Boston bank, which had taken the vessel over as collateral. The official custom house documents named J. F. Quinn, of Cambridge, as owner. On March 10, 1925, Quinn, as owner, entered into a charter party with the Cape Ann Steamship Company, a Massachusetts corporation, for a bareboat charter of the vessel for a period of six months. This agreement required the charterer to operate, man and equip, and supply the vessel, pay all wages, provisions, stores, and other costs and expenses of operation. It expressly stated that the charterer did "not have the right to incur, nor will it allow to arise or attach, any maritime lien." On April 11, 1925, the Cape Ann Steamship Company subchartered the vessel to a New Jersey corporation, the Newark & Boston Steamship Company. By express provision, there was incorporated into this subcharter the same terms as in the previous charter, except the charter hire to be paid by the Newark & Boston Steamship Company, the subcharterer, to the Cape Ann Steamship Company, the original charterer, was fixed at 50 per cent. of the net proceeds of the operation of the vessel. On August 26, 1925, the Cape Ann Steamship Company made a second subcharter with the Newark & Boston Steamship Company, which supplemented the first subcharter and by its terms expressly incorporated the prohibition against liens. The charter hire was rearranged and fixed at $200 per month.

On September 10, 1925, the original six months charter from Quinn to the Cape Ann Steamship Company expired, and thereupon Quinn chartered the vessel directly to the Newark & Boston Steamship Company, and by the terms of this charter it was provided that all expenses be paid by the charterer, and prohibitory liens are expressly incorporated by reference. This charter was extended from time to time until February 24, 1926, by the exchange of a series of letters. On April 28, 1925, the appellee talked with the captain of the vessel, soliciting business. The captain said that at this interview he advised the appellee that he was going on a run from Newark to Boston, and told him the number of the crew and the quantity of provisions to supply for their requirements. He showed the appellee the ship's papers, which indicated Quinn as the owner, and told him that "a company was going to operate the boat from Newark to Boston, and probably would have more than one boat"; that the same manager was going to manage for the new charterer. This is not disputed by the appellee. Appellee admits that he was told that people in Newark operated the vessel, while Quinn, of Cambridge, owned it. At the office of the pier, he saw the name of the Newark & Boston Steamship Company prominently displayed. During the period deliveries were made once or twice a week. The captain usually telephoned the orders, but employees of the Newark & Boston Steamship Company did also. Duplicate delivery slips, as well as monthly statements, were sent to the steamship company in Newark.

The testimony is clear that the appellee was advised that the Newark & Boston Steamship Company operated the vessel under a charter, and that, when he asked to see the charter, he was promised an opportunity to look at it; but this promise, made by the manager of the operating company, was not fulfilled. Appellee said that he wanted to see the charter at a time when he was owed $2,500, and when, as he said, he was "looking for his money and how the thing was being run"; but he continued supplying foodstuffs until the bill amounted to $5,600. He made no inquiries about the terms of the charter, nor did he see Quinn, the owner, through whom he might have seen a copy of the charter. Nor did he bill Quinn for the provisions.

The Act of Congress of June 5, 1920 (41 Stat. 1005 [46 USCA § 973]), provides that, if the lienor "knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party * * * the person ordering the repairs, supplies, * * * was without authority to bind the vessel therefor," no lien can arise. In United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361, a libel was filed against the United States and the receiver of a steamship company for supplies furnished to two steamers. The ships were owned by the United States and chartered to an operating company. By the terms of the charter, the corporation was to pay all costs and expenses, and agreed it "will not suffer nor permit to be continued any lien," etc. It further provided that the corporation would cause such vessel to be discharged from such lien in any event within 15 days after it was imposed. Whether a maritime lien existed for the supplies furnished was certified for answer by this court to the Supreme Court.

The act of 1910 (36 Stat. 604) there considered, after enlarging the right to a lien and providing who shall be permitted to have authority for the owners to procure supplies, qualifies the whole by stating that nothing in the act should be considered to confer a lien, when the furnisher knew, or by the resources of reasonable diligence could have ascertained, that, because of the charter, the person ordering the supplies was without authority to bind the vessel.

The court held that the libelant could have discovered this, and said at page 489 of 260 U. S. (43 S. Ct. 182): "If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms, he was chargeable with notice of its terms." There the libelants contended that the charter party contemplated the possibility of a lien and provided for its removal, relying upon The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386. The court said that the language employed there was different, and that here "the primary undertaking is that a lien shall not be imposed." From what is said by the court, it is apparent that a materialman is not entitled to rely upon presumptions, but must inquire forthwith when he is advised that the boat is in hire under charter.

In The South Coast, 251 U. S. 519, 40 S. Ct. 233, 64 L. Ed. 386, the libelant furnished supplies to a vessel under charter, the contract providing that the charterer was to pay all charges and save the owners harmless from all liens. It provided that the owner might retake the vessel in case of failure to discharge within 30 days any debts which were liens upon it. When the supplies were ordered, the owner's representative warned the libelant that it must not furnish supplies on the credit of the vessel. By the act of 1910, a master appointed by the charterer has authority from the owner to procure supplies. The charter party there recognized that liens could be imposed and allowed to stand for less than the month. Subsequently there was nothing from which the furnisher of the supplies could have ascertained that the master did not have the power to bind the ship.

In North Coast Stevedoring Co. v. United States, 17 F.(2d) 874 (C. C. A. 9th), the vessel was sold by the United States under a conditional bill of sale, which provided that no liens could be imposed. The libelant contended that the agreement did not provide

that the buyer was without authority to bind the vessel, and that, if it did so provide, the libelant could not have ascertained this prohibition. The court found that the agreement did so provide. The libelant knew the United States sold the vessel, and the court said that they should have known it was under some sort of contract. The only inquiries made were of the buyer's local agent on the Pacific Coast. The court said that the libelant, knowing of some contract of sale, "made no inquiry of the master of the vessel, of the Shipping Board, at the home port, or from any person who would be at all likely to know the facts, or furnish the desired information."

In Morse Dry Dock & Repair Co. v. United States, 1 F.(2d) 233, we considered a libel where the only inquiry made was of the vice president of the charterer, who stated that the vessels were bought from the United States and that the government would pay for the reconditioning. Libelant never asked to see the contract, or never inquired of the Shipping Board on the subject. We said (page 238) in holding that the libelant could not recover: "In choosing to rely solely upon the loose statements made to it by an officer of the steamship company, it did so at its own risk, and must abide the consequences. The facts were readily ascertainable; the inquiry into the facts was a duty under the statute, and when a duty to make inquiry exists, it must appear that the one whose duty it was to inquire prosecuted his inquiry with all the care and diligence required of a reasonably prudent man," and "that duty is not discharged by accepting the statement of an interested party without any examination of the title papers which would have disclosed a want of power to create a lien upon the property involved."

While the appellee was diligent enough to ask to see the charter, he failed when he did not insist on seeing it. He might have found Quinn and made inquiry of the owner. He was not justified in relying solely upon the statement made by the manager of the charterer. The master of the Roseway was not the appellant's agent. The appellee failed to comply with the requirements of the statute, and has no lien against the vessel. United States v. Carver, supra; Morse Dry Dock & Repair Co. v. United States, supra; North Coast Stevedoring Co. v. United States, supra; Standard Oil Co. v. United States, 1 F.(2d) 961 (C. C. A. 4th).

Decree reversed.