## MORSE DRY DOCK & REPAIR CO. v. UNITED STATES. THE PRINCESS MATOIKA. THE POCOHONTAS. THE SUSQUEHANNA. THE POTOMAC. THE ANTIGONE. THE GEORGE WASHINGTON.[*]

(Circuit Court of Appeals, Second Circuit. July 1, 1924.)

No. 342.

Maritime liens ☞30—Repairer of vessels under contracts with charterer, without inquiry as to ownership, held not entitled to lien.

The United States, through the Shipping Board, chartered vessels to a steamship company under a contract requiring the company to recondition the vessels at its own expense, and prohibiting the imposition of liens thereon. Libelant did the work of reconditioning under contracts with the company, to which it looked for payment. It accepted the statement of one of its officers that the company had bought the vessels, without further inquiry, though the charter was matter of record and of public notoriety, commented on in the newspapers. The government afterward retook the vessels from the steamship company for breach of contract; a part of libelant's claim being unpaid. *Held* that, assuming that the work done by libelant was repair work and not reconstruction, and such as might give the right to a lien under Act June 23, 1910 (Comp. St. §§ 7783–7787), or Act June 5, 1920, c. 250, § 30, subsecs. P–T (Comp. St. Ann. Supp. 1923, §§ 8146¼ooo–8146¼q), under the provisions of both acts it was its duty to make reasonable inquiry, and, having failed to do so, it was not entitled to a lien.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty in personam by the Morse Dry Dock & Repair Company against the United States, as owner of the steamships Princess Matoika, Pocohontas, Susquehanna, Potomac, Antigone, and George Washington. From a decree for the United States, libelant appeals. Affirmed.

For opinion below, see 298 Fed. 153.

[*]Certiorari denied 45 S. Ct. 99, 69 L. Ed. ——.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City (Walter Schaffner, of New York City, of counsel), for the United States.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. The libelant is a corporation organized and existing under the laws of the state of New York. It is engaged in the business of repairing ships, and has its plant and principal place of business in the borough of Brooklyn, in the Eastern district of New York. It is one of the largest ship repair plants in the harbor of New York. It filed its libel in a cause of contract, civil and maritime, in the Eastern district of New York against the United States. It alleged that the United States, directly or indirectly, through the United States Shipping Board, or the United States Shipping Board Emergency Fleet Corporation, was and now is the owner of the following steamships: Princess Matoika, Pocohontas, Susquehanna, Potomac, Antigone, and George Washington.

Its libel stated that each of these vessels was a merchant vessel, and for the labor, materials, and supplies and other necessaries furnished by the libelant would have been subject to a maritime lien in favor of libelant for the amounts claimed, if the steamers had been privately owned, and a proceeding in admiralty therefor could have been maintained. It further stated that at the instance and request of the respondent, and of the person to whom lawful possession and management of each of the vessels had been intrusted by the United States, the libelant between December 21, 1920, and August 26, 1921, performed labor and furnished materials, supplies, and other necessaries to said vessels to the extent of about $580,000. A statement was attached to the libel showing the labor, materials, supplies, and other necessaries furnished to each vessel, and the amounts paid as credits on the bill, being $100,000 on account of the Princess Matoika, and $54,620 on account of the Pocohontas, and that this left a balance due to the libelant in the sum of $424,185.50, with interest from the date when the labor, materials, supplies, and other necessaries were furnished. A decree was asked directing the payment of the claim.

The suit was brought as an action in personam pursuant to the act of Congress approved March 9, 1920 (Comp. St. Ann.

Supp. 1923, §§ 1251¼–1251¼l). Separate libels were filed against the several ships. Those against the Susquehanna, the America, the Princess Matoika, and the Pocohontas were filed in the district of New Jersey; those vessels being at the time at Hoboken, in the state of New Jersey, and within the jurisdiction of that court. The libel against the Potomac was filed in the district of Connecticut; the vessel being at the time in New London, in the state of Connecticut, and within the jurisdiction of that court. But in the case of all the vessels they were in the port of New York at the time the materials, supplies, and necessaries sued for were furnished.

These various suits were subsequently removed into the District Court for the Southern District of New York. This was in accordance with the provisions in section 2 of the Act of March 9, 1920. That section provides, in the class of cases to which the act is applicable, that "upon application of either party the cause may, in the discretion of the court, be transferred to any other District Court of the United States." Thereupon, and on October 4, 1923, and upon the consent of the proctors on each side, an order was entered in the District Court for the Southern District of New York, consolidating all the libels into one action.

The steamships herein involved were German vessels, which the United States seized during the war with the German Empire, and thereafter and during the continuance of the war used for the transportation to and from the continent of Europe of the troops of the United States. The only use to which any of the ships were put after they came into the possession of the United States, and while the war lasted, was for this transportation of the troops, and at no time during the period was any of the vessels employed as a merchant marine.

With the close of the war the United States wished to get the ships into mercantile service and to have established a purely transatlantic line. The United States, with that end in view, and acting through the United States Shipping Board, hereinafter called the Shipping Board, entered into an agreement, dated May 28, 1920, with the United States Mail Steamship Company, hereinafter called the Steamship Company, in which it agreed to charter to the latter certain vessels, including those against which these libels were filed and which are herein involved. Thereafter charter parties were entered into in accordance with the agreement above referred to, in each of which it was agreed that the Steamship Company as charterer, following delivery of the vessel to it, would "promptly at its own cost and expense recondition said vessel in accordance with plans and specifications" to be prepared and approved. It was also agreed that the charterer hired the vessel from the time of the completion of the reconditioning for a period of five years, the steamer to be employed by the charterer in carrying lawful merchandise and passengers, so far as accommodations allowed. It provided that the charterer at the termination of the charter party should have an option to purchase the vessel at a price and on terms to be fixed by the United States, the initial cost of reconditioning the vessel, less depreciation at the rate of 7½ per centum per annum of said cost to be applied on said purchase price. It was also provided that in case of the redelivery of the vessel to the United States the latter was to pay the charterer when the vessel was redelivered the initial amount expended by the charterer in reconditioning the vessel less a deduction of 7½ per centum of said amount for depreciation. Before the time came when the charterer could avail itself of its option the United States retook the ships from the Steamship Company. This it did in August, 1921, for a reason soon to be mentioned.

The reconditioning of the ships as provided for in the agreement between the United States and the Steamship Company was completed at a cost of about $600,000, and soon thereafter the government took them out of the possession of the Steamship Company. It appears that the latter was without adequate financial resources to enable it to perform its obligations according to the terms of the charter parties. Those agreements contained the following provisions:

"A certified copy of this charter will be carried with the ship's papers; and the charterer shall take such other appropriate steps, as designated to it by the owner from time to time or required by the circumstances, as will give notice to the world that the charterer has no right, title or interest in said vessel save and only the right specifically conferred on the charterer by this charter party, and that the charterer has no right, power or authority to suffer or permit to be imposed on or against said vessel any liens or claims which might be deemed superior to, or a charge against, the title and ownership of the owner of said vessel. * * *

"(11) If, at any time after the delivery of the said vessel to the charterer hereunder, the charterer shall fail to perform any of its agreements herein made, the owner shall have the right at any time after such default to withdraw the said vessel from the service of the charterer, without prejudice to any claim which the owner may have against the charterer pursuant to this charter party, whereupon charter hire shall cease, and all rights and claims of the charterers hereunder shall terminate."

The Steamship Company had contracted for the making of repairs upon these vessels and left unpaid bills therefor which aggregated more than $400,000. This it did, notwithstanding its agreement in the charter parties that "the charterer will not suffer or permit to be continued any lien, incumbrance, or charge which has or might have priority over the title and interest of the owner in said vessel; but the charterer will in due course, and in any event within 15 days after the same becomes due and payable, pay, discharge or make adequate provision for the satisfaction or discharge of every lawful claim or demand which, if unpaid, might, in equity, in admiralty, at law or by any statute * * * operate as a lien, incumbrance, or charge upon said vessel. * * *" It was due to the failure of the Steamship Company to perform this part of its agreement with the United States that the government took back the vessels—exercising the rights reserved to it in the charter parties. This left the complainant with an unpaid claim of more than $400,000, which it sought to enforce payment of through the suits now before the court.

Act June 23, 1910, § 1, provided "that any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel." 36 Stat. part I, c. 373, p. 604 (Comp. St. §§ 7783–7787). It was argued on behalf of the United States, in the court below and in this court, that the work done by the libelants was "reconditioning" and not "repairing," and that therefore no lien upon the vessels was obtained, neither was there any right of action against the United States.

This court had occasion to construe the above statute in The Susquehanna, 267 Fed. 811, and we expressed the opinion that a strict construction was to be given to the act, and that it applied to repairs rather than to a reconstruction of the vessel. The purpose of the section above quoted was to give a lien enforceable in rem in the cases in which the section was applicable without the necessity of proving that credit had been given to the vessel. Prior to the enactment of the statute, in the case of repairs, supplies, or other necessaries ordered by the owner in the home port, the presumption had been that they were furnished on the credit of the owner, in the absence of proof that they were given on the credit of the vessel.

In the instant case the only evidence as to the work done on the vessels was that the cost was about 20 per cent. of their value. This the court below held was not sufficient to justify the conclusion that the work amounted to a reconstruction of the vessels as distinguished from a repairing of them. We cannot say that this was error, especially in view of the subsequent decision in New Bedford Dry Dock Co. v. Purdy, 258 U. S. 96, 42 Sup. Ct. 243, 66 L. Ed. 482, in which the court said it did not think that any refined distinction was to be made between reconstruction and repairs, and that the word "repairs," as used in the statute, has a broad meaning. "This court has not undertaken," it was said, "and will not now essay to announce rigid definitions of repairs and new construction."

This brings us to inquire as to the knowledge, or lack of knowledge, of the libelant of facts affecting its right to enforce the lien which it seeks to assert. Mr. Edward P. Morse, who was the active head of the libelant company, was examined at length as to his knowledge or lack of knowledge as to the ownership of the vessels and as to the liability or nonliability of the United States for the repairs which his company had contracted to make. During the time that his company was engaged in making repairs upon the vessels it was his understanding that the Steamship Company had purchased the vessels from the United States, and this continued to be his understanding until he read in the newspapers that the government had taken back the ships. The Matoika was the first ship delivered at the libelant's yard, and after it was delivered and work was commenced on it Morse testified he made no inquiry "as to what was the status of these vessels as between the United States Mail and the Shipping Board." He had

previously testified that Capt. Koester, who was the vice president of the Steamship Company, had informed him that the latter had bought the Matoika and would purchase several others, and that the Shipping Board was to recondition the ships and pay the bills for the work. On his cross-examination he testified as follows:

"Q. When Capt. Koester told you that they had bought the Matoika, and the Shipping Board was going to repair it, have you ever had a situation presented to you like that before, where there was an entire reconditioning of the vessel after it was sold, which was paid for by the man who sold it? A. No.

"Q. That was absolutely unheard of by you, wasn't it, such a situation? A. Well, not exactly.

"Q. Do you know of any other like it? A. Why, while I wasn't told, my impression was that the ships were in such a condition that the Shipping Board, before turning them over, would put them in condition to run.

"Q. Did you ever hear of a situation like that before, where the amount of work compared to anything like this was done by a seller of a vessel after he had sold it?

"Mr. Brown: I object to that question, because, if it is a hypothetical question, it doesn't state the facts."

It appears that the work on the ships was done under oral contracts, except the work on the America. As to that ship there was a written contract to which we shall later refer. On his cross-examination Morse testified further as follows:

"Q. Leaving the America out for a minute—did you ever receive any money from the United States of America on these ships? A. Yes; we did on certain—there is certain work that the Shipping Board ordered themselves.

"Q. Leave that out of consideration, Mr. Morse? A. No; we didn't.

"Q. You got all your money, except on the steamship America, from the United States Mail Steamship Company? A. Yes.

"Q. Their own personal checks? A. Yes.

"Q. That is the corporation's checks? A. Yes.

"Q. Not drawn on the Treasury of the United States? A. No. * * *

"Q. Your usual custom, when you wanted to get money for this work, was to go to the United States Mail Steamship Company's office? A. We go to whoever owed the money; that is our usual custom.

"Q. That is your usual custom to go to whoever owed the money? A. Yes.

"Q. In this case, when you wanted money, you went to the United States Mail Steamship Company, didn't you? A. Yes.

"Q. And you went there quite frequently? A. Yes. * * *

"Q. As I understand it, Capt. Koester told you that the United States Mail was to pay your bills? A. Yes.

"Q. You didn't understand from Capt. Koester that the Shipping Board was going to have anything to do with you, except to check up your bills? A. Right.

"Q. They weren't to pay you? A. No; the United States Mail was to pay our bills.

"Q. You didn't understand that you had any claim against the Shipping Board at that time, did you? A. Only—we have against the ship always.

"Q. You claim you have a lien? A. Yes; a lien on the ship.

"Q. But I am not speaking whether that is true as a legal proposition. I am trying to get your views at that time, the way you felt at that time as to whether you had a claim against the Shipping Board? A. I don't know that I thought about that at all. I simply believed that the United States Mail had purchased the ships, and that the United States Mail would pay my bill; they owned the ships, so naturally I worked accordingly.

"Q. And they told you that the Shipping Board was going to reimburse them for this expense? A. For reconditioning; yes.

"Q. Did they tell you when the Shipping Board was to reimburse them? A. No.

"Q. Did you ask them? A. No. * * *"

The written contract for the reconditioning of the steamship America, made between the libelant and the Steamship Company, specifically stated that the vessel was owned by the United States and had been chartered by the government to the company, and one of its provisions was that the company should "promptly at its own cost and expense recondition the vessel in accordance with plans and specifications to be prepared by it, subject to the approval of the United States." It also stated that "title to the vessel itself and all work and material thereon, whether completed or not, at all times shall be in the United States."

In view of this written contract, the following excerpt from the testimony of Morse on the cross-examination is illuminating:

"Q. Of course, so far as the steamship America is concerned, you knew all the time that you did work on the America that

it was not the property of the United States Mail Steamship Company, didn't you? A. Yes; our specifications stated so.

"Q. And you knew that that vessel, at least, was only chartered by the United States Mail Steamship Company? A. Yes; I did.

"Q. And you had knowledge of the date of the contract, didn't you, between the United States Mail and the United States? A. No; I didn't know anything about any contract.

"Q. Didn't the contract between you and the United States Mail refer to a specific contract? A. Well, that is why I wanted the payments guaranteed.

"Q. I say, you knew, at the time you read this contract and signed it, that there was a contract of May 28, 1920, between the Board and the United States Mail? A. Yes.

"Q. You never asked anybody, either connected with the United States Mail or the Shipping Board or the Fleet Corporation, for that contract? A. Yes.

"Q. You knew, didn't you, likewise, that vessels were registered at the United States custom house? A. Yes.

"Q. Did you ever instruct any one in your behalf to go to the United States custom house to examine the titles of these vessels? A. No.

"Q. Did you ever go? A. No.

"Q. To your own knowledge did anybody representing the Morse Dry Dock & Repair Company ever go to the custom house for that purpose? A. No; if anybody did, I would have sent them there."

This makes necessary a consideration of United States v. Carver, 260 U. S. 482, 43 Sup. Ct. 181, 67 L. Ed. 361. In that case the court had under consideration the Act of June 23, 1910, and that of June 5, 1920. The court held that under these statutes no lien arises for supplies furnished a chartered vessel where the charter forbids it, and where the materialman, by reasonably diligent investigation, could have ascertained there was a charter and gained knowledge of its terms.

Section 3 of the Act of June 23, 1910, provided that "nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel there-

for." The act of 1920 repeats the words of the act of 1910. In commenting upon the language used in these acts the court in the Carver Case said:

"We regard these words as too plain for argument. They do not allow the materialman to rest upon presumptions until he is put upon inquiry; they call upon him to inquire. To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms, he was chargeable with notice of its terms. In this case it would seem that there would have been no difficulty in finding out both."

In our opinion the Carver Case is decisive of the case now before the court. The libelant herein was bound to inquire, and had no right to rest upon presumptions. If he had inquired, if he had exercised reasonable diligence, he could certainly have ascertained the terms of the charter party, and that the Steamship Company, in ordering the repairs, was without authority to bind the vessels. In the Carver Case the charter party provided: "The charterer will not suffer or permit to be continued any lien, incumbrance or charge which has or might have priority over the title and interest of the owner in said vessel." The language used in the charter parties now before the court, and which has been heretofore set forth in this opinion, is identical with that used in the Carver Case. In that case the libelants got no lien, and for exactly the same reasons in this case the libelant, in our opinion, has no lien. There is no distinction between the two cases.

We have not overlooked the fact that Morse states that officials of the Steamship Company had stated that it had bought the vessels, and that the government had agreed to pay for putting the ships in condition to operate. But he never asked to see the contract between the Steamship Company and the United States, and he never addressed any inquiry to the Shipping Board upon the subject. He trusted to the representations made to him, although he knew that the contracts for the reconditioning of the ships was made with the Steamship Company, and that that company was to pay the bills. He believed the company owned the ships, but never asked to see the contract of sale.

On his cross-examination Morse was asked concerning the sale of these vessels

by the United States to the Steamship Company and testified as follows:

"Q. The sale of a number of vessels like that is a matter of considerable importance in maritime circles in New York, isn't it? A. Yes.

"Q. It would be extremely unlikely that such a sale could take place without the majority of men interested in those things knowing about it, wouldn't it? A. Yes; it would be unlikely.

"Q. You read the newspapers, I suppose? A. Yes; every day.

"Q. Have right along? A. Yes.

"Q. Did in 1918, 1920, 1921? A. Yes.

"Q. What papers do you read? A. New York Herald. * * *

"Q. As a matter of fact there was considerable in the papers about this deal between the United States Mail Company and the United States, wasn't there? A. I think so; Yes.

"Q. It was a matter of considerable importance to the public? A. Yes.

"Q. It was commented on a great deal by the papers, wasn't it? A. Yes.

"Q. And you, being in the ship repair business, naturally read those articles, didn't you? A. I presume so."

And it appears that there was published in the New York Herald on May 30, 1920, in its first column, a Washington dispatch stating that the former German ships which the government had in its possession, naming them, and including those herein involved, had been chartered to the Steamship Company, and that they were to be reconditioned at its own expense. This was prior to the agreement that the libelant was to do the work on the ships, as the first of the vessels to enter the libelant's yard was the Matoika, which entered the yard in December, 1920.

On January 14, 1921, a meeting of the Shipping Board was held at Washington, at which Morse was present. Subsequently all the other ships herein involved were sent to the libelant's yard to be reconditioned. At that meeting, and while Morse was in attendance, it was distinctly stated that these vessels were chartered, and that it was important to hasten the time when they would get into service and the government would begin to receive payments under the charters. All this was in answer to criticism as to the manner in which the contract for the repair work had been made; there being no written specifications covering the amount of the work and no competitive bidding. Notwithstanding these matters naturally would have made an impression on the mind of Morse, they did not, according to his testimony, attract his attention, and passed unnoticed. The court below, who saw and heard the witness, appears to have accepted Morse's testimony as truthful, and we shall so regard it.

But, granting that Morse tells the truth, and that he did not know that the Steamship Company was merely the charterer of the vessels, the libelant's case must fail. This necessarily must be the result, in view of the language of section 3 of the act of 1910, heretofore quoted, that "nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that * * * the person ordering the repairs * * * was without authority to bind the vessel therefor." And it is our opinion that, while the libelant did not know that the Steamship Company was without authority to bind the vessel, it might readily have ascertained the want of authority to do so, if it had exercised the "reasonable diligence" in making the inquiry which it was its duty under the statute to make. The libelant chose to rely upon a statement made to it by an officer of the Steamship Company which had the vessels in its possession, but did not ask to see the papers which conferred upon it its right of possession, and it made no inquiry of the United States Shipping Board or of the government of the United States from which the Steamship Company acquired whatever rights it had in the ships. If it had made the least effort to ascertain the facts, it would have known that the Steamship Company could not create a lien on the vessels.

In choosing to rely solely upon the loose statements made to it by an officer of the Steamship Company, it did so at its own risk, and must abide the consequences. The facts were readily ascertainable; the inquiry into the facts was a duty under the statute. And when a duty to make inquiry exists, it must appear that the one whose duty it was to inquire prosecuted his inquiry with all the care and diligence required of a reasonably prudent man. If A., about to purchase land of B., chooses to rely upon B.'s statement that he has title to the property, and does not demand the production of the title deeds, and buys the property without examining them, he has not exercised due diligence, and is chargeable with culpable negligence, and with constructive notice of all the facts which he

might have learned by means of a due inquiry. Hewitt v. Loosemore, 9 Hare, 449, 458; Hopgood v. Ernest, 3 De Gex, J. & S. 116, 121; Atterbury v. Wallis, 8 De Gex, M. & G. 454, 466. See, too, Kirsch v. Tozier, 143 N. Y. 390, 38 N. E. 375, 42 Am. St. Rep. 729; Petrain v. Kiernan, 23 Or. 455, 32 Pac. 158; 2 Pomeroy's Eq. Jur. (3d Ed.) § 612. A purchaser is charged with notice of any deed forming a part of his chain of title and of every collateral instrument recited or referred to, as well when it is unrecorded as when it is recorded. 2 Pomeroy's Eq. Jur. (3d Ed.) § 628. The purchaser cannot relieve himself from the effect of what the deed discloses by his failure to examine the deed of B. before he purchased. If he chooses to rely upon B.'s oral statement, he does so at his peril, and is charged with notice of all he would have learned, if he had made due inquiry by an examination of the deed.

The principle involved in this case seems to us somewhat analogous to that involved in the cases above considered. In both classes of cases there is the duty to make inquiry, and that duty is not discharged by accepting the statement of an interested party without any examination of the title papers which would have disclosed a want of power to create a lien upon the property involved.

Affirmed.

MANTON, Circuit Judge, concurs in the result.