NEW YORK HARBOR DRY DOCK COR-
PORATION v. UNITED STATES et al.

(District Court, S. D. New York. March 27,
1926.)

Maritime liens ⬿30—Reconditioner of vessel,
under charter from Shipping Board, held not
entitled to a lien.

The United States, through the Shipping
Board, chartered a vessel to a steamship com-
pany under a contract requiring the company
to recondition it at its own expense, and pro-
hibiting the imposition of liens thereon. Libel-
ant contracted with the company to recondition
the vessel, in which it was encouraged by of-
ficers and the local representative of the Ship-
ping Board. It had full knowledge of the con-
tract and charter party under which the com-
pany held the vessel, but undertook and com-
pleted the work in good faith in the belief and
under advice of counsel that it was entitled to a
lien therefor. Before full payment for the work,
the Shipping Board retook possession of the
vessel under right reserved in the contract.
*Held*, that, in view of the provisions of the
contract and charter, it was not entitled to a
lien in the absence of any evidence that the
officers of the Shipping Board had authority
to in any way bind the United States.

In Admiralty. Suit by the New York
Harbor Dry Dock Corporation against the
United States and the United States Mail
Steamship Company, Inc. Decree dismissing
libel.

Duncan & Mount, of New York City (by
Russell T. Mount and Cecil Page, both of
New York City), for libelant.

Emory R. Buckner, U. S. Atty., of New
York City (by Walter Schaffner, of New
York City), for the United States.

GRONER, District Judge. This is a suit
in admiralty in personam against the United
States under the Act of March 9, 1920
(Comp. St. §§ 1251¼–1251¼*l*). The United
States Mail Steamship Company was orig-
inally joined as a respondent, but its insol-
vency has eliminated it as a factor in the sit-
uation. For convenience it will be spoken of
hereafter as the steamship company.

The contract between the steamship com-
pany and the United States, which is involved
here, is the same contract construed by the
Circuit Court of Appeals of this Circuit in
Morse Dry Dock Co. v. United States, 1 F.
(2d) 233, and the charter party for the
vessel, for the costs of whose recondition-
ing this suit is brought, is in all respects iden-
tical with those examined in that case except
as to dates, names, and perhaps some minor
matters of pure inconsequence. A reference
to the opinion of the court in the Morse Case
will therefore supply details as to these mat-
ters and make unnecessary any extended ref-
erence to them in what may hereafter be said
in this case. It is very earnestly insisted on
behalf of the libelant that the resemblance of
this case to the Morse Case is limited to the
matters just referred to, and that, because of
this fact, the conclusions of the court in the
Morse Case are neither applicable nor bind-
ing in this. The facts by which it is claimed
this result is accomplished are briefly these:
Libelant is, or perhaps it is more accurate to
say was, a dry dock and ship repair corpora-
tion, organized a few years ago with the ac-
tive encouragement of the Shipping Board to
compete for government work and thus fur-
nish what apparently had been previously
lacking in the New York situation; that is to
say, active competition in bidding. It had
been the low bidder for reconditioning a num-
ber of Shipping Board vessels, but had either
failed to get the contract or the work had been
postponed.

In January, 1920, the Antigone, which had
some time previously been chartered to the
Steamship Company (with an option to pur-
chase) was ready for reconditioning. Libel-
ant was encouraged by Shipping Board offi-
cials to become a bidder for the work and was
invited to appear before the Board in Wash-
ington and submit its claims. This it did, and
in addition furnished the local—that is to say,
the New York—representative of the Ship-
ping Board with a copy of its schedule of
prices and actively sought the work at the
hands of the steamship company.

On January 18 libelant received a letter
from the steamship company confirming an
oral agreement to recondition the Antigone,
having first, as I have already intimated, had
a number of personal interviews with the of-
ficers of that company, and having likewise
received an intimation from Commander
Gatewood, then a representative of the Ship-
ping Board, that it would be awarded the con-
tract for reconditioning the Antigone. The
letter was brief, and confirmed the agreement
to do the work, and fixed the dates of payment
for the work in several installments covering
the period of a little more than three months
after the completion of the work. Apparent-
ly in order to secure a somewhat more formal
contract, the libelant on January 19 wrote the
steamship company the following letter:

"We are in receipt of your letter of the
18th instant, stating the terms of payment for
work to be done on the steamship Antigone.
In view of the unusual charter conditions,
etc., we would like to have a statement from
you something like the form of letter inclosed.
Should the form be at variance with your

ideas, we shall be glad to discuss modifications at your convenience. We assume that it would be proper for us to have the approval of the Shipping Board to the arrangement between us, but will make no move in this direction until we have a complete understanding with you."

The form of letter inclosed with the one just read was substantially like the answer which was received in due course, which was as follows:

"In response to your letter of January 19th, 1921, I beg to reply as follows:

"As charterers of the steamship Antigone, owned by the U. S. Shipping Board, under an agreement which gives us full power and authority to recondition this vessel, subject to the approval of the United States Shipping Board, we hereby authorize you to proceed to recondition the steamship Antigone as a passenger vessel, and to perform any service to or for said vessel, performing said reconditioning according to the rates which have been submitted to us.

"In consideration of your agreement that you will not exact payment in full for said reconditioning, upon progress of the work, we agree to make partial payments to you as outlined below, upon approval of your bills and estimates by our vice president in charge of construction and repairs, under whose supervision this work is to be done; such work to be carried out in accordance with his instructions, said amounts being payable at our office, at 120 Broadway, New York, as follows."

Then follows a list of the installment contracts with their dates of maturity and this sentence, viz.: "It being understood and agreed that you shall not lose your maritime lien against the steamship Antigone in any way by reason of the deferring of payments for such work."

The letter concluded with a statement of the person who is designated to authorize the work and approve it.

As I recall the evidence, the correspondence which is read was submitted in its entirety to the libelant's board of directors, and at the suggestion of a member of the board counsel were employed to advise the board specifically whether the contract as proposed would create a lien on the vessel for the work done. The report of counsel after examination of the contract and charter party between the Shipping Board and the steamship company was that the company might safely proceed with the work, and, in the event of non-payment by the steamship company, might legally assert its lien against the vessel.

The work was accordingly completed, the ship delivered. Thereafter there was default in the payment of some of the installments. There was a considerable amount of correspondence, in which the chairman of the Shipping Board participated, all in an endeavor to clear the matter in default, which was unsuccessful, and thereafter the Shipping Board, for reasons which appeared to it satisfactory and as it had a right to do, canceled the contract and retook possession of the vessel. A number of letters and likewise details of a number of conversations between the officers of the libelant and the chairman of the Shipping Board and the latter's New York representative, Capt. Gatewood, were introduced and admitted in evidence, it should be said over the objection of counsel for the government. These both oral and documentary tend to show that both Admiral Benson and Capt. Gatewood were impressed with the bona fides of libelant's claim and believed it should be assumed and paid by the United States. Doubtless the reason for this is that both of these gentlemen recognized that the libelant was largely influenced by their encouragement to bid for the work and also by the fact that, in repossessing itself of the vessel, the United States had gotten the benefits and should therefore in good conscience assume the burdens. But, in spite of this and in spite also of Capt. Gatewood's testimony that in conversations with the president of the libelant company about coincident with the making of the contract for the work, he had informed the latter that the steamship company was in his opinion the agent of the United States and the latter was responsible for the debts—I say, in spite of all of this—it is not contended on behalf of the libelant that anything either in the correspondence or in the conversations, either at time the contract was made or after the default in payment of the contract price, created either a ratification by the United States of the contract of the steamship company or bound the United States either as agent or guarantor to discharge that company's indebtedness. No other position than this would in my judgment be tenable, in the absence of some evidence showing authority on the part of these individuals to bind the United States in any respect. Apparently the purpose of the introduction of the evidence was to complete the picture and to demonstrate the fact upon which the claim is urged, viz. that libelant did all that a reasonably prudent man could or should have done to ascertain the facts upon which its rights depended and having acted in good faith, with prudence and diligence, its

rights are not foreclosed by the Clio and Morganza decisions.

The fallacy of this position, as I see it, is that it presupposes that the principle announced in those cases depended upon the diligence or lack of diligence upon the part of the lien claimant. It is true that right to a lien under the Act of June 23, 1910 (Comp. St. § 7783–7787), was denied in those cases because of the failure of the lien claimant to ascertain facts which he could have ascertained in the exercise of due diligence, and which, if and when ascertained, would have put him on notice that the person with whom he was dealing had no right, either directly or indirectly, to create a lien on the vessel. In those cases the persons furnishing the supplies, as in the Morse Case, were content to rest upon the ostensible ownership of the vessels by the parties in possession and for failure to make inquiry they lost their rights. In this case inquiry was made; the true facts were ascertained. The contract was examined. The limits and boundaries of the steamship company's rights were known in advance but their legal effect was either misconceived or misconstrued. The contracts themselves, in words which the Supreme Court has held sufficient for that purpose, provided, as did also the charter party, that the steamship company should not and could not create a lien on the vessel. The third section of the Act of 1910 (Comp. St. § 7785), specifically provides that, if. the furnisher knew or in the exercise of ordinary care should know this fact, the provisions of the section giving the lien do not apply.

It follows, therefore, that the libel should be dismissed, and a decree will accordingly be entered.