LINDBAR, INCORPORATED, Claimant-Appellant,

v.

ST. LOUIS FUEL & SUPPLY COMPANY, Inc., Libelant-Appellee.

No. 13842.

United States Court of Appeals Sixth Circuit.

April 9, 1960.

George W. Grider, Memphis, Tenn. (Burch, Porter, Johnson & Brown, Memphis, Tenn., on the brief), for appellant.

Apperson, Crump, Duzane & McRae, Memphis, Tenn. (W. Emmett Marston of Martin, Tate & Morrow, Memphis, Tenn., on the brief), for appellee.

Before SHACKELFORD MILLER, Jr., and CECIL, Circuit Judges, and WILLIAM E. MILLER, District Judge.

CECIL, Circuit Judge.

This is an appeal from an order and judgment in the District Court for the Western District of Tennessee, whereby a maritime lien against the vessel Lindbar, formerly Lannes J, was held valid. The trial judge entered judgment against the respondent, the M/V Lindbar, in the sum of $1,423.21, with interest and costs.

Lindbar, Incorporated, Claimant-Appellant, became the owner of the vessel in question through purchase by Fontaine M. Johnson from Gladys Johnson. Fontaine M. Johnson, president of the corporation, denied the validity of the lien.

Pertinent facts as found by the trial judge are as follows: On September 28, 1957, A. C. Johnson, of Helena, Arkansas, owner of the M/V Lannes J, leased the vessel under a bare-boat charter to Mid-Central Towing Company of Tulsa, Oklahoma. S. P. Johnson, son of the owner, was president of this company.

In October, November and December, of 1957, the Libelant, St. Louis Fuel & Supply Company, Inc., a corporation, at the request of S. P. Johnson furnished supplies to the M/V Lannes J at the Port of St. Louis, on the Mississippi. The reasonable value of these supplies was $1,423.21. The lien was asserted in order to obtain payment of this amount.

The home port was not shown on the vessel and the only identifying marks were the name "Lannes J" and the number "224455" which were painted on the sides. On October 7, 1957, S. P. Johnson called his father at Helena, Arkansas and discussed with him additional marine equipment required for the vessel. The calls were made from the office of the libelant and in the presence of Mr. R. J. Chouner, an officer of the company, who handled the transactions.

At the time the supplies were furnished the M/V Lannes J was not documented, licensed or enrolled at Memphis, Tennessee, its home port on the official customs registry and documentation books. It was officially documented and enrolled in the collector's office on December 6, 1957. In the meantime, it had permission from the Collector of Customs, by letter, dated September 18, 1957, to engage in temporary operations.

A Bill of Sale of the vessel from A. C. Johnson to his wife Gladys was recorded in the Memphis Customs' office, on December 16, 1957. This Bill of Sale was signed and acknowledged by A. C. Johnson, November 18, 1957. The Bill of Sale gave the date of sale as December 11, 1957, and Lorrene as the name of the vessel. The name was not officially changed to Lannes J until December 16, 1957. The records of the customs' office show that the same vessel was sold by Gladys Johnson to Fontaine M. Johnson, on January 23, 1958. Fontaine was another son of A. C. Johnson.

There are other "findings" to the effect that S. P. Johnson did not disclose to the libelant the existence of a charter or the nature of its terms and that by his conduct he caused it to believe that either he or his company was the owner or agent of the owner authorized to bind the vessel.

The facts as found, except No. IV and No. XIII, are not clearly erroneous. There are, however, other important facts disclosed by the evidence. The management and control of the vessel was entrusted by A. C. Johnson, the owner, under charter to Mid-Central Towing Company, not to S. P. Johnson as stated in "finding" No. IV. In "finding" No. XIII it is stated that Fontaine Johnson recognized the claim of the libelant. If this refers to the libelant's claim for money due from Mid-Central Towing Company, it is correct. It is clearly erroneous if it means that he recognized the claim as a valid lien against the vessel. The charter provided, "Neither the Charterer nor any of its servants, agents, or employees, nor the master of the vessel, shall have any right, power or authority to create or incur or suffer or permit to be placed upon the vessel any maritime or other lien or encumbrance or charge, or to incur any debt or obligation, or charge upon the credit of the vessel."

S. P. Johnson's associates put over $20,000 into the Mid-Central Towing Company while he himself put in only about $750. The company paid $10,000 in consideration of the charter agreement and agreed to pay $5,000 per month charter hire. The Mid-Central's venture failed and the vessel in a damaged condition was put on the ways in Greenville, Mississippi. It was then turned over to Mrs. Johnson, the owner, by the company's attorney, at the end of December, 1957.

Mr. A. C. Johnson made application in September, 1957, at the office of the Collector of Customs in Memphis, for documentation of the vessel in question under name of Lannes J. Due to the inability of the office to admeasure the vessel, a temporary permit to operate was granted by letter dated September 18, 1957. After this date, any inquirer at the collector's office would have received information that A. C. Johnson was the owner of the Lannes J.

The charter was a tightly drawn, strictly legal instrument, between owner and charterer, with no indication of any family favoritism or leniency. The capital investment of S. P. Johnson was very small as compared with that of his associates, none of whom was a member of the family.

Mrs. Johnson was the third wife of A. C. Johnson and the stepmother of his sons S. P. and Fontaine M. Johnson. The sale of the vessel from Mrs. Johnson to Fontaine was a strictly legal and business transaction. From all the evidence submitted at the trial, no inference adverse to the claimant is warranted from finding of fact No. XII that the transactions were within the family.

It would be more accurate to say that the telephone calls from S. P. Johnson to his father referred to in finding No. VII were for advice rather than to discuss additional marine equipment required for the M/V Lannes J.

To these facts the trial judge applied the following principle of law: "In the absence of anything to put libelant, St. Louis Fuel & Supply Company, on inquiry, it was not compelled to search the records to ascertain the authority of S. P. Johnson to order supplies for the

---

vessel" (Conclusion of Law IV). In support of this the court cited The Oceana, 2 Cir., 244 F. 80, certiorari denied, 245 U.S. 656, 38 S.Ct. 13, 62 L.Ed. 533, and International Refugee Organization v. Maryland Drydock Co., 4 Cir., 1950, 179 F.2d 284.

■ The Maryland Drydock case is not in point. In that case the dealing was with the owner or an agent whose authority was admitted. The principle of the Oceana case is in conflict with the pronouncement of the Supreme Court, in United States v. Carver, 260 U.S. 482, 488, 43 S.Ct. 181, 182, 67 L.Ed. 361. The court said: "The Act of 1910 by which the transactions with the Clio were governed, after enlarging the right to a maritime lien and providing who shall be presumed to have authority for the owner to procure supplies for the vessel, qualifies the whole in section 3 (Title 46, Section 973) as follows: 'But nothing in this Act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for the sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.' We regard these words as too plain for argument. *They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire.* To ascertain is to find out by investigation. If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms." (Emphasis added.)

■ Concerning the Oceana and other cases, the court said: "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times."

In Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of California, 310 U.S. 268, 275, 60 S.Ct. 937, 84 L.Ed. 1197, cited in the trial judge's conclusions, the court recognized the rule of the Carver case. The lien was allowed for the reason that the charter did not prevent liens from attaching.

The rule of the Carver case has been recognized or followed in the following cases: The Kongo, 6 Cir., 155 F.2d 492; Tampa Ship Repair & Dry Dock Co. v. Esso Export Corp., 5 Cir., 237 F.2d 506; Hercules Co. v. Brigadier General Absolom Baird, 3 Cir., 214 F.2d 66, 71; Findley v. Red Top Super Markets, Inc., 5 Cir., 188 F.2d 834; The Western Wave, 5 Cir., 77 F.2d 695; Morse Dry Dock & Repair Co. v. United States, 2 Cir., 1 F.2d 233.

■ Whether the libelant could have ascertained by the exercise of reasonable diligence that the vessel was under a bare-boat charter which prohibited the attachment of liens is a question of fact.

■ The Findings of Fact of the trial judge tend to support the theory that there was nothing to put the supplier on inquiry that there was a charter party or that Mid-Central Towing Company did not have authority to bind the vessel. There is not a single finding of any affirmative act by Mr. Chouner, Secretary-Treasurer of the libelant, in the nature of an inquiry.

The evidence shows that he talked to the pilot and visited and examined the pilot house. After talking to the pilot he assumed S. P. Johnson's father was backing him. His testimony is " * * * We found out that his dad was backing him. And there is no real support for that supposition here, only that the pilot told us that. We have to admit that part of it" (77a Appendix for Appellant). The fact that no charter was displayed in the pilot house would not justify the conclusion that there was none, nor would it satisfy the duty to inquire.

Mr. Chouner testified that it was his opinion that Mr. A. C. Johnson was the owner or was in some representative capacity (77a Appendix for Appellant). Believing this he still made no inquiry,

886

in spite of the fact that his invoices were made to Mid-Central Towing Company and not to A. C. Johnson.

There were a number of avenues of inquiry or of investigation open to the libelant, none of which was pursued prior to the extension of credit. Some of these sources of information were explored after the libelant realized that its account was in default. If it had made as careful an investigation in the first instance as it did later, it would have learned the true facts.

We conclude that an erroneous principle of law was applied to the facts and that the libelant failed to exercise reasonable diligence to ascertain the authority, or lack of authority, of S. P. Johnson to bind the vessel.

For these reasons the judgment of the District Court is reversed and the case remanded with instructions to dismiss the libel.