**S. S. OMNIUM FREIGHTER, Respondent-Appellant,**

v.

**NORTHWEST MARINE IRONWORKS, INC., Libelant-Appellee.**

**No. 17798.**

United States Court of Appeals Eighth Circuit.

Feb. 18, 1965.

Conrad M. Fredin of Butchart, Fredin & Eaton, Duluth, Minn., made argument for appellant and filed brief.

Edward T. Fride of Sullivan, McMillan, Hanft & Hastings, Duluth, Minn., made argument for appellee and filed brief.

Before VOGEL, MATTHES, and RIDGE, Circuit Judges.

VOGEL, Circuit Judge.

This is a proceeding in admiralty tried to the court without a jury. The parties herein will be designated as they were below. Libelant (appellee), Northwest Marine Ironworks, Inc., claims a maritime lien for repairs to the S. S. Omnium Freighter, respondent (appellant), based upon the provisions of 46 U.S.C.A. §§ 971 and 972. The repairs were made at libelant's shipyard in Portland, Oregon, in March 1963. Seizure of the vessel was effected at Duluth, Minnesota. Subsequent to seizure, bond was filed guaranteeing payment in the event it was determined that the lien was effective and the vessel was permitted to proceed on her way. No dispute exists regarding the performance of the repairs or the reasonableness of libelant's charge. Respondent defended against libelant's claim on the ground that the vessel had been under a bareboat charter at the time in question and that the charter by clear and express terms withheld from the charterer the authority to bind the vessel and that libelant had failed to exercise reasonable diligence to ascertain the existence and terms of this charter as required by 46 U.S.C.A. § 973 as follows:

> *"Notice to person furnishing repairs, supplies, and necessaries*
>
> "The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; *but nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."*
> (Emphasis supplied.)

Trial before the District Court in St. Paul, Minnesota, resulted in judgment in favor of the libelant. The trial court's opinion directing judgment is published in 228 F.Supp. 943. Respondent perfected this appeal. The only issue remaining in the case at this level is whether the libelant exercised that "reasonable diligence" provided for by § 973,

supra, to ascertain the existence of a charter party agreement.

The District Court found:

## "XIV.

"During the time that the Steamer Omnium was available to libelant for inspection and repair at Portland, Oregon in March of 1963, and until repairs were completed, no notice of the existence and terms of the bareboat charter was ever posted on board the ship.

## "XV.

"Prior to furnishing .labor and materials to the Steamer Omnium, libelant searched the pilot house of the vessel for notices and found none.

## "XVI.

"To all external appearances the Steamer Omnium, in March, 1963, was owned and operated by Mol Shipping and Trading, Incorporated.

## "XVII.

"Libelant exercised reasonable diligence to ascertain whether, because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs was without authority to bind the vessel therefor.

## "XVIII.

"Libelant did not know, nor could it have known by exercise of reasonable diligence, that because of the existence of the charter party, or mortgage, the person ordering the repairs was without authority to bind the vessel therefor."

The trial court also found, and it is undisputed, that in September and October 1960, about two and one-half years prior to the making of the repairs herein, that title to the vessel Omnium Freighter was in Mol Shipping and Trading, Inc.; that at that time and also prior thereto libelant had had occasion to inquire and did determine as a fact that the Omnium Freighter was owned by Mol Shipping and Trading, Inc. However, on June 12, 1961, Mol sold the vessel to Laurence Steamship Company. On the same date, Laurence Steamship Company gave Mol a seven-year bareboat charter at a charter hire of $8,035 per month, which charter contained the prohibition against the right, power or authority to create or incur liens on the vessel. When the sale and lease back on the same day were made, the name of the vessel was not changed. Under all of these circumstances, the trial court held that the libelant had exercised that reasonable diligence required by § 973, supra.

There is no dispute in the record about the fact that the sale from Mol to Laurence Steamship Company and the lease of the vessel back to Mol constituted an arm's length transaction. It must also be conceded that the owner, Laurence Steamship Company, did everything within its power to protect against a lien on its vessel and to give notice to the public of the charter's existence. The charter provided, *inter alia:*

"NOTICE OF BAREBOAT CHARTER:

"This vessel is the property of LAURENCE STEAMSHIP COMPANY. It is under charter to MOL SHIPPING AND TRADING INC. and, by the terms of the charter neither the Charterer nor the Master has any right, power or authority to create, incur, or permit to be imposed upon the vessel any lien whatsoever, except for crew's wages and salvage.

"The Charterer agrees also to display on board any notices required by the Mortgagees in a conspicuous place and to maintain same during the life of the mortgage in accordance with requirements of the mortgage."

The mortgage provided that certified copies thereof should be carried with the ship's papers on board the vessel and exhibited on demand and that notices should be prominently displayed in the chart room and in the master's and

purser's cabins of the vessel and in such other places on board as may be from time to time and at any time required by the mortgagee. Custom also required such posting.

In appealing, it is claimed by the respondent that:

"*The trial court erred in finding that libelant exercised reasonable diligence to ascertain whether or not the persons ordering the repairs to the vessel possessed authority to confer a lien upon the ship.*"

■ The determination of fact issues based upon contradictory and disputed testimony rests peculiarly with the trier of the facts, in this case the District Court sitting without a jury. It was the duty of the trial judge, after hearing the testimony and seeing the witnesses, to find the facts and draw conclusions therefrom. Admiralty Rule 46½, 28 U.S.C.A. Appellate review of such findings is extremely limited. In McAllister v. United States, 1954, 348 U.S. 19, at page 20, 75 S.Ct. 6 at page 8, 99 L.Ed. 20, the Supreme Court stated:

" * * * In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Boston Ins. Co. v. Dehydrating Process Co., 1 Cir., 204 F.2d 441, 444; C. J. Dick Towing Co. v. The Leo, 5 Cir., 202 F.2d 850, 854; Union Carbide & Carbon Corp. v. United States, 2 Cir., 200 F.2d 908, 910; Koehler v. United States, 7 Cir., 187 F.2d 933, 936; Walter G. Hougland, Inc. v. Muscovalley, 6 Cir., 184 F.2d 530, 531, certiorari denied, 340 U.S. 935 [71 S.Ct. 490, 95 L.Ed. 675]; Petterson Lighterage & Towing Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992, 994–995. A finding is clearly erroneous when

'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' United States v. Oregon State Medical Society, 343 U.S. 326, 339 [72 S.Ct. 690, 96 L.Ed. 978]; United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 92 L.Ed. 746]."

In a quite recent case, the Supreme Court had occasion to reassert the rule. See Guzman v. Pichirilo, 1962, 369 U.S. 698, 702, 82 S.Ct. 1095, 1098, 8 L.Ed.2d 205:

" * * * The determination of the factual content of ambiguous testimony is for the trial court, and such determination can be set aside on review only if 'clearly erroneous.' United States v. National Association of Real Estate Boards, 339 U.S. 485, 495–496 [70 S.Ct. 711, 94 L.Ed. 1007] (1950).

"The 'clearly erroneous' rule of civil actions is applicable to suits in admiralty in general, McAllister v. United States, 348 U.S. 19, 20 [75 S.Ct. 6, 99 L.Ed. 20] (1954); see Roper v. United States, 368 U.S. 20, 23 [82 S.Ct. 5, 7 L.Ed.2d 1] (1961), and to the existence of the operative facts of a demise charter party in particular, Gardner v. The Calvert, 253 F.2d 395, 399 (C.A. 3d Cir.1958). Under this rule an appellate court cannot upset a trial court's factual findings unless it 'is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 92 L.Ed. 746] (1948)."

■ First the trial court was presented with a disputed fact question on the matter of posting. Respondent's testimony, through the captain of the vessel, was that he received a copy of the bareboat charter, typed two notices thereof and filed the charter in his cabin. Libelant's testimony through several witnesses was to the effect that the wit-

nesses had looked for notices on board the vessel and had found none. The matter of notice being much in dispute and the trial court's conclusion that no notice was posted being based upon substantial testimony, it may not be set aside here. It is clear, however, that the absence of posting alone is not sufficient justification for the conclusion that there was no charter or mortgage. See Lindbar, Incorporated v. St. Louis Fuel & Supply Co., 6 Cir., 1960, 276 F.2d 882, 885:

> "* * * The fact that no charter was displayed in the pilot house would not justify the conclusion that there was none, nor would it satisfy the duty to inquire."

In addition, however, to the fact that the trial court found no posting, it supported its conclusion and judgment in favor of libelant by stating:

> "The evidence of the case at bar shows that libelant had dealings with the Omnium group[1] concerning the Omnium Freighter prior to the event that gave rise to this suit. Libelant on that occasion checked the ownership of the vessel. When the vessel returned to libelant's shipyard, negotiations were conducted by the same parties that had previously dealt with libelant. Omnium still controlled the vessel, its officers and crew. The name had not changed. All bills had been promptly paid by Omnium."

After seeing no notices posted, the libelant was apparently content to rely on the fact that two and a half years prior thereto it had learned that Mol Shipping and Trading Company was the owner. It indulged in the presumption that because Mol officers were in charge in March 1963 and the name of the vessel had not been changed, that ownership likewise remained the same. Mr. Farr, vice president and general manager of the libelant who testified he inspected the vessel for notices said that:

> "Q. And based on that prior knowledge [the knowledge that two and a half years prior thereto Mol owned the vessel], you assumed that Omnium[1] was the owner in 1963, is that correct?
>
> "A. That is correct."

The only positive action taken by the libelant, according to the record, was to look on board the vessel for notice and upon finding none, to *assume* that ownership had not changed since 1960. Such inquiry cannot possibly constitute that "reasonable diligence" referred to by the statute. The Maritime Lien Law makes it the duty of the libelant to actively and positively inquire and charges it with the knowledge such inquiry would have disclosed. See John Baizley Ironworks v. United States, E.D.Pa., 1925, 6 F.2d 25, 26; Morse Dry Dock & Repair Co. v. United States, 2 Cir., 1924, 1 F.2d 233, 238, 239; Pascagoula Dock Station v. Merchants & Marine Bank, 5 Cir., 1959, 271 F.2d 53, 55; United States v. Daniels Towing & Drydock, 5 Cir., 1954, 214 F.2d 501.

In Lindbar, supra, 276 F.2d at page 886, the court stated:

> "There were a number of avenues of inquiry or of investigation open to the libelant, none of which was pursued prior to the extension of credit. Some of these sources of information were explored after the libelant realized that its account was in default. If it had made as careful an investigation in the first instance as it did later, it would have learned the true facts."

In The Liberator, 4 Cir., 1925, 5 F.2d 585, the court stated at page 586:

> "While there was much to warrant libelant in the belief, having regard to its previous transactions with the several vessels of the Atlantic, Gulf & Pacific Steamship Corporation during the preceding seven months, that it was dealing alone with that company, and that its bill would be paid as usual by that company, and that it actually did not know of the interest of the government in the

1. A division of Mol Shipping and Trading Company, Inc.

ship, still the government was the owner of the vessel, and the Atlantic, Gulf & Pacific Company merely an agreed purchaser in possession, and held the ship according to the terms of the contract of purchase, and the government's ownership could have been ascertained by inquiry at the home port of the vessel at San Francisco. That would at least have put libelant on inquiry as to whom the ship belonged, as well as to the authority of those operating it; and it seems manifest from an examination of libelant's witness Hammond, general agent of the Atlantic, Gulf & Pacific Steamship Corporation at San Francisco, that while he had not detailed information of the conditions under which the ship had been held and operated, he knew or believed that they had not been paid for, and had probably been sold on the deferred payment plan. This would also have put libelant on inquiry, and admonished it that it could not with safety perform the service on the faith and credit of the ship, assuming Hammond would have given the information he now imparts."

It was there held that the libelant "having failed to exercise the reasonable diligence required of it, indeed having in effect made no inquiry to ascertain the true ownership of the vessel to which the service was rendered, no recovery can be had for the same, nor the amount sued for, either against the ship or its owner, the United States of America."

What could libelant have done here other than merely look to see whether notices were posted on board the Omnium Freighter? The record indicates that it could have made inquiry of Captain Lidwin, the master of the vessel, who knew of the charter and who claims to have posted notices thereof. It did not do so. It could have made inquiry from James D. Byrne, who ordered the repairs long before the vessel reached Portland and who knew the facts and who testified he would have properly responded to inquiry. It did not do so. It could have inquired from Albert E. Ossa, port engineer, during the period of repair and from him have likewise received correct information concerning ownership. It did not do so. It could have asked to see the ship's papers which were carried on board the vessel and would have disclosed the true ownership and the existence of the charter and mortgage. It did not do so. It could have checked "The Record" of the American Bureau of Shipping and the supplements thereto which were available in its own office. It did not do so, although "The Record" for 1962 clearly shows Laurence Steamship Company as the owner of the Omnium Freighter. It pursued none of these lines of inquiry but relied on the fact that it saw no notices posted on the vessel and the presumption that because Mol was the owner of the vessel two and one-half years prior thereto it still was the owner. Such a presumption is prohibited and when it rested thereon without making an investigation, it was acting clearly contrary to the mandate of § 973, supra. In United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361, the Supreme Court had before it a similar problem. Therein Mr. Justice Holmes, after quoting from the Act of June 23, 1910, c. 373, § 3, 36 Stat. 605, which in language is identical with § 973, supra, stated at page 489 of 260 U.S., at page 182 of 43 S.Ct.:

"* * * We regard these words as too plain for argument. *They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire. To ascertain is to find out by investigation.* If by investigation with reasonable diligence the materialman could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms." (Emphasis supplied.)

The libelant would depreciate the statements in Carver by quoting from Gilmore and Black, The Law of Admiralty (1957), at page 563, wherein the writers state:

" * * * Like baseball players and law book writers, Judges have their off days, and the day when Justice Holmes wrote his Carver opinion was one of his worst. Without the slightest warrant in the Lien Act or prior case law, he assumed that the materialman is always under a duty of inquiry as to the actual authority of the person with whom he deals and thus introduced an unnecessary confusion which has never since been dissipated. In doing this he overlooked or ignored an able discussion of the point in The Oceana, one of the certiorari denied cases unavailingly cited by counsel."

If the great Holmes nodded on the day he wrote his opinion in Carver, he had eight other Justices nodding with him, for the opinion is unanimous. In addition, it has been consistently cited and followed thereafter.[2]

In 1940, Mr. Chief Justice Hughes, in another unanimous opinion, Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co. of Calif., 310 U.S. 268, 60 S.Ct.

937, 84 L.Ed. 1197, seemed to completely approve of the rule of Carver when he said at page 275 of 310 U.S., at page 941 of 60 S.Ct.:

"When, however, the charter party, with knowledge of which the material-man is charged, prohibits the creation of a lien for supplies ordered by the charterer or the charterer's representative, no lien will attach. This was decided in United States v. Carver, 260 U.S. 482 [43 S.Ct. 181, 67 L.Ed. 361]. That was a case of vessels owned by the United States. The charterer, whose representative had ordered the supplies, had agreed that it would 'not suffer nor permit * * * any lien' which might have priority over the title and interest of the owner. The question was whether a maritime lien would have arisen against the vessels if they had been privately owned. The court, quoting the provision of the Act of 1910 as to the duty of the material-man to make inquiry, said that he was not entitled 'to rest upon presumptions until he is put upon inquiry'; he must inquire. 'If by investigation with reasonable diligence the material-man could have found out that the vessel was

2. See United States v. Daniels Towing & Drydock, 5 Cir., 1954, 214 F.2d 501, 503; Findley v. Red Top Super Markets, 5 Cir., 1951, 188 F.2d 834, 836, certiorari denied, 342 U.S. 870, 72 S.Ct. 112, 96 L.Ed. 654; The Kongo, 6 Cir., 1946, 155 F.2d 492, 496, certiorari denied, 329 U.S. 735, 67 S.Ct. 99, 91 L.Ed. 635; The Western Wave, 5 Cir., 1935, 77 F.2d 695, 697–698, certiorari denied, 296 U.S. 633, 56 S.Ct. 156, 80 L.Ed. 450; The Olympia, D.C.Conn., 1932, 58 F.2d 638, 642; The Roseway, 2 Cir., 1929, 34 F.2d 130, 131–132, certiorari denied, 280 U.S. 592, 50 S.Ct. 39, 74 L.Ed. 640; The Dictator, D.C.E.D.La., 1927, 18 F.2d 131, 133; The American Star, 3 Cir., 1926, 11 F.2d 479, 481–482; The Gul Djemal, D.C.S.D.N.Y., 1925, 11 F.2d 153, 155, aff'd 2 Cir., 1926, 11 F.2d 156, certiorari denied, 254 U.S. 619, 41 S.Ct. 217, 65 L.Ed. 442; John Baizley Ironworks v. United States, D.C.E.D.Pa., 1925, 6 F.2d 25, 26; Standard Oil Co. v. United States, 4 Cir., 1924, 1 F.2d 961, 963, certiorari denied, 267 U.S. 591, 45 S.Ct. 228, 69 L.Ed. 803; Morse Dry Dock & Repair Co. v. United States, 2 Cir., 1924, 1 F.2d 233, 238, certiorari denied, 266 U.S. 620, 45 S.Ct. 99, 69 L.Ed. 472; Cooper Stevedoring of Louisiana, Inc. v. Alter Company, D.C.E.D.La., 1964, 230 F.Supp. 991, 992; Ocean Cargo Lines, Ltd. v. North Atlantic Marine Co., D.C. S.D.N.Y., 1964, 227 F.Supp. 872; In re North Atlantic & Gulf S. S. Co., D.C. S.D.N.Y., 1962, 204 F.Supp. 899, 907, aff'd Schilling v. A/S D/S Dannebrog, 2 Cir., 1963, 320 F.2d 628; American Marine Corp. v. Towboat Z-Fourteen, D.C.W.D.La., 1961, 214 F.Supp. 849, 852, aff'd 5 Cir., 1963, 316 F.2d 238; Diaz v. The S. S. Seathunder, D.C.Md., 1961, 191 F.Supp. 807, 818; Marine Chartering Co. v. Schirmer Stevedoring Co., D.C. N.D.Cal., So.Div., 1961, 194 F.Supp. 488, 491.

under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms'. The court added that there would have been no difficulty in finding out both. * * * The lien was denied, not because the charterer was bound to provide and pay for supplies but because the charter party prohibited the lien. To the same effect is the decision in the case of The St. John's. Colonial Beach Company v. Quemahoning Coal Company, 260 U.S. 707 [43 S.Ct. 246, 67 L.Ed. 474]."

The Sixth Circuit, in Lindbar, supra, followed Carver and in doing so referred to The Oceana, (relied on by Gilmore and Black as having an "able discussion of the point") by saying at page 885 of 276 F.2d:

"* * * The principle of the Oceana case is in conflict with the pronouncement of the Supreme Court, in United States v. Carver, 260 U.S. 482, 488, 43 S.Ct. 181, 182, 67 L.Ed. 361."

In Carver, Mr. Justice Holmes also referred to the Oceana case as follows, page 490 of 260 U.S. on page 182 of 43 S.Ct.:

"* * * The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times. Therefore it is unnecessary to consider whether the libellants' argument is supported by the decisions to which they refer. The Yankee, sub nom. Rivers & Harbors Imp. Co. v. Latta, 243 U.S. 649 [37 S.Ct. 476, 61 L.Ed. 946]. The Oceana, sub nom. Morse Dry Dock & Repair Co. v. Conron Bros. Co., 245 U.S. 656 [38 S.Ct. 13, 62 L.Ed. 533]."

On the same day that it decided Carver, January 2, 1923, the Supreme Court, by per curiam, 260 U.S. 707, 43 S.Ct. 246, 67 L.Ed. 474, reversed the Court of Appeals for the Fourth Circuit in Colonial Beach Co. v. Quemahoning Coal Co., 4

Cir., 1921, 273 F. 1005, which had held at page 1006:

"* * * * A supply man who knows nothing about a ship, other than it is a ship in possession of those who order supplies for her, may furnish them upon her credit, without making further inquiry, taking the chance—usually a remote one—that the possession of her was tortiously acquired."

We conclude that the rule of Carver is still the law; that it is applicable here; that the libelant could have with reasonable diligence determined the real ownership of the vessel and the existence of a bareboat charter. Having made no inquiry whatsoever with the exception of merely looking for notices and finding none, and having failed to pursue any of the opportunities it had to obtain correct information, we are left with the definite and firm conviction that the trial court was mistaken when it held that libelant had exercised that "reasonable diligence" required by § 973.

Reversed and remanded with directions to enter judgment in behalf of the respondent.