Jose Garcia DIAZ

v.

THE S.S. SEATHUNDER, her boilers, engines, tackle, apparel and furniture, and Preston Corporation of Monrovia, Liberia.

No. 4002.

United States District Court
D. Maryland.

March 1, 1961.

Bernard M. Goldstein, Marvin I. Singer, Baltimore, Md., for libelant.

John H. Skeen, Jr., Baltimore, Md., for Atlantic Cordage & Supply Corp.

Robert H. Williams, Baltimore, Md., for Dalzell Towing Co. and Robert Aikman. Thomas W. Jamison, III, Ober, Williams, Grimes & Stinson, Baltimore, Md., for claimant-respondent. David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., for Maryland Shipbuilding & Drydock Co. William A. Hackney, Baltimore, Md., for Charles F. Hughes, trading as Vane Brothers.

R. DORSEY WATKINS, District Judge.

The question before the court is whether or not intervening libelants, Maryland Shipbuilding & Drydock Company, Atlantic Cordage & Supply Corporation, Dalzell Towing Company, Inc., et al. and Charles F. Hughes, are entitled to maritime liens against the S. S. Seathunder in view of language prohibiting the creation of liens contained in a bareboat charter dated April 6, 1956, between the corporate respondent, Preston Corporation of Monrovia, Liberia (Preston) as owner, and Ocean Trading Corporation (Ocean) as charterer. A copy of the charter has been filed in these proceedings. Paragraph 19(a) of the charter provides as follows:

"Neither Charterer nor the Master of the Vessel nor any other person shall have the right, power or authority to create, incur or permit to be placed upon the Vessel any lien whatsoever other than for crew's wages or salvage. Charterer will at all times carry a properly certified copy of this charter with the ship's papers on board the Vessel, and will exhibit the same to any person having business with the Vessel, and also exhibit the same to any representative of Owner on demand."

It has been stipulated that the master of the Seathunder, if called as a witness, would testify that at all times there was on board the vessel, among the ship's papers in his desk, a certified copy of this charter which he would have exhibited to anyone who wished to see it.

The Seathunder is a T-2 tanker which was acquired in 1953 by Preston, a Liberian Corporation. She was documented under the laws of the Republic of Liberia at all times involved in this litigation. On April 6, 1956 the vessel was chartered for ten years, under the charter mentioned above, by Preston to Ocean, also a Liberian Corporation. The vessel was delivered by Preston to Ocean under the charter at Baltimore on April 11, 1956, this charter being in effect at all times herein involved. Ocean had time-chartered the Seathunder to Panama Transport Corporation for five years, and the vessel was delivered under said time charter between April 11, 1956 and April 30, 1956. This charter provided it could be suspended for a period of between 30 to 31 months, and in accordance with such provision the charter was suspended in August of 1957. On August 16, 1957 Ocean chartered the Seathunder to Wanda Compania Naviera, S.A. (Wanda) for a number of successive voyages up to and including March 31, 1960. The vessel was delivered under this charter on September 6, 1957, and was under it at the time she arrived at the yard of Maryland Shipbuilding & Drydock Company (Maryland) on March 9, 1958 for her annual inspection, Ameri-

can Bureau of Shipping survey and certain repairs.

### Claim of Maryland Shipbuilding & Drydock Company (Maryland)

Maryland's original intervening libel alleged that during March 1958, the Seathunder was in the yard of the intervening libelant and was furnished by said intervening libelant with certain materials, supplies, repairs and other necessaries "at the instance and request of her owner *pro hac vice* to whom the management of the vessel was intrusted", the reasonable value of the materials, etc. stipulated as being $136,378. Subsequently, Maryland filed an amended intervening libel alleging that the materials, supplies, etc. had been furnished at the instance and request of the demise charterer of the Seathunder to whom the management of the vessel was intrusted; and that these materials, supplies, etc. had been obtained by the fraud of the vessel and of the demise charterer in that at the time when the vessel and the demise charterer accepted and received them, the vessel and the demise charterer were unable to pay for them and had no intention of doing so; that the demise charterer was insolvent; and that such inability to pay and insolvency were fraudulently concealed from Maryland by the vessel and by the demise charterer.

The evidence showed that in January 1958, James May, a salesman employed by Maryland in its New York office, knowing that certain repair work was required for the vessel, solicited the job from Thomas Haller, Marine Superintendent of Ocean. At the request of Haller, Maryland worked up an estimate on the cost of a new set of heating coils and in January advised Haller that Maryland estimated the cost at $35,000. The estimate was prepared by Felix Horvatt, an estimator employed by Maryland at its Baltimore yard. Before the vessel arrived in the yard, Maryland made a firm commitment with Haller to do the work in question for $35,000. Meanwhile Haller decided to give Maryland additional work incident to the annual survey and drydocking required for insurance purposes by the American Bureau of Shipping. Sometime in February 1958, he so informed Maryland. Unlike the heating coil installation, it was impossible to determine in advance the exact extent or cost of the annual survey work, but from past experience Haller and Maryland anticipated that it would be in the range of $50/60,000. Since the total repairs then anticipated would cost in the neighborhood of $90,000, "Maryland was interested in *Ocean's plans* for paying the bill." [1] On February 27, 1958, Thomas O'Hara, of Maryland's Financial Department, went to New York and had lunch with A. T. Philpotts, Jr., President of Ocean. May was also present. May knew that Ocean did not own the vessel but had her under charter. He assumed that O'Hara was also aware of this fact. O'Hara asked Philpotts to give him a copy of his latest financial statements, together with other financial information. Philpotts declined, saying that he could not then divulge such information because of pending business transactions. O'Hara asked him whether he had a charter for the vessel, and whether he had authority to order the work. Philpotts replied that the vessel was under a favorable long term charter and that he had the right to place the work in hand. As Maryland often accepts assignments of charter hire to cover bills due or to become due to it, O'Hara according to his own testimony would, and should, have asked to see the charter but did not do so as he was afraid that such a request would be refused in view of Philpotts having previously declined to make available to O'Hara other requested financial information. From Philpotts' answers O'Hara stated that he assumed that Ocean was either the owner of the Seathunder or was authorized directly by the owner to contract for the repairs in question. Philpotts then gratuitously added that the placing of this repair order was no different from that on the S.

---

1. Quoting from Maryland's pretrial memorandum—emphasis supplied.

S. Franco Lisi. This was a vessel actually owned by Ocean which Maryland had repaired some time before and on which a balance of $10,000 had been due for at least a year, the major portion of the bill having been covered, and paid, by insurance. O'Hara testified that he next asked Philpotts whether he would pay the $10,000 balance on the Franco Lisi if Maryland would extend credit to Ocean and that Philpotts said that he would. On March 7, 1958 Philpotts wrote to Maryland on behalf of Ocean as follows:

"To confirm our conversations during your visit to New York regarding the intended stay of the subject vessel at your Yard, I wish to outline below our understanding:

"1) The vessel will undergo, under the supervision of Mr. H. T. Haller, our Marine Superintendent, repairs and drydock to complete our annual inspection together with other work at Mr. Haller's direction. Mr. Haller has estimated this work to amount to about $50,000/$55,000.-00.[2]

"2) Upon completion of the above-mentioned work, you have agreed *to allow us to pay* the then rendered invoice at the rate of $6,500.00 per month if the invoice is $55,000.00 or less and $7,500.00 per month if the invoice is in excess of $55,000.00.

"3) Ocean Trading Corporation now owes your firm $10,000.-00 for past work done on the M. T. Franco Lisi. We will pay this amount in full on Monday, March 10.

"If the above is your understanding and meets with your approval, please sign the enclosed copy of this letter and return same to us.

"I wish to say that it was a pleasure to meet with you and *I very much appreciate your extending this credit arrangement to us.* I am looking forward to meeting with you again in the near future." (Emphasis supplied.)

Philpotts' letter was duly accepted by Maryland upon the authorization of its Secretary-Treasurer subject to the execution by Ocean of notes for the agreed upon monthly payments. These notes, which were never executed by Ocean, expressly reserved any lien Maryland might have against the Seathunder and Maryland's right to proceed in admiralty against the vessel. On March 10, 1958, Maryland received payment in full on the Franco Lisi. On March 9, 1958, the Seathunder arrived in Maryland's yard. Due to arbitration proceedings then in progress representatives of both Preston and Ocean went on board the vessel upon her arrival in the yard on that date. Arbitration had been necessitated by the fact that shortly after the Seathunder had been delivered by Preston to Ocean in April 1956 the vessel broke down at sea. Subsequently she was repaired in various shipyards on the East and Gulf coasts on four different occasions in 1956 and 1957. Ocean claimed that most of this work was required due to the vessel's unseaworthiness at the commencement of the charter, and thus a breach of the owner's warranty of seaworthiness, contained in the charter party, had occurred. The matter was submitted to three arbitrators who commenced their consideration of the controversy late in 1957. In the course of their deliberations they inspected the ship on one or more occasions prior to her arrival in Maryland's yard on March 9, 1958. On that day the arbitrators met on board the vessel in the yard. Counsel for both the charterer and the owner were present, and counsel for the latter, James Estabrook, Esq., of the New York Bar, had with him his technical expert, Harper Simpson. Again on March 12, 1958, the same group inspected the vessel while in drydock at Maryland's yard. No in-

---

2. This $50/55,000 estimate did not include the $35,000 previously agreed to for the heating coil replacement.

quiry was made by Maryland as to who the persons aboard were or as to their reason for inspecting the vessel. Within twenty-four to forty-eight hours after the Seathunder's arrival, Mr. Horvatt, Maryland's estimator, learned from Mr. Haller, Ocean's Maritime Superintendent, that Ocean did not own the Seathunder but had her under charter from the owner, Preston. At no time did Mr. May or Mr. Horvatt, although both were on actual notice of the existence of a charter, ask to see the charter or make any inquiry as to its terms. Maryland admits that it did not deal with Preston or any representative of Preston and that neither Mr. Estabrook nor Mr. Simpson ordered or approved the repairs made to the Seathunder.

The work on the Seathunder was completed on March 25, 1958. On March 27, she was libeled by a member of the crew for unpaid wages. At about the same time Maryland's Financial Department was informed by its Estimating Department that the price of the repairs to the Seathunder would exceed the original estimate. This increase was due to the fact that after drydocking it was found that other work of substantial proportions was required. O'Hara, desiring more security for the completed repairs than that contemplated by the credit arrangement previously suggested, notified Philpotts by telephone that the work performed would push the bill considerably over $100,000 and requested that Philpotts give Maryland a series of twelve notes for $11,000 each, and one blank note to cover any balance due upon final settlement, one $11,000 note to fall due each month commencing April 30, 1958, until the bill was paid. Although it was at this time that O'Hara first definitely learned from Philpotts the actual name of the owner of the Seathunder, on February 27, when O'Hara made his initial contact with Philpotts, the latter had

mentioned that an arbitration proceeding relative to the Seathunder was pending against her owner and others and that he, Philpotts, had a large claim amounting to hundreds of thousands of dollars against said parties. The matter of Philpotts' arbitration claim was again mentioned by Philpotts to O'Hara on March 28, one day after the vessel, while still lying in Maryland's yard, had been libeled for unpaid wages, attached and a monition posted, such libel, attachment and monition apparently being unknown to O'Hara, although he was financial representative of Maryland. In addition, Philpotts referred to the possibility of a Creditors' Committee being formed by agreement between the various creditors of Ocean and of other Philpotts' companies affiliated with Ocean. Yet neither on February 27 or March 28, did O'Hara make any inquiry into the possibility of an assignment to Maryland of monies which Philpotts hoped to collect from arbitration then in progress.[3] Nor did he ever inquire as to the value or the condition of the vessel as he testified that he never expected to have to execute on her. Instead, in the face of all of the warning signals then flying, both as to Ocean's precarious financial condition and the likelihood that the charter to Ocean would contain the usual provisions prohibiting the creation of liens against the Seathunder, he proceeded to send a second series of notes to Philpotts together with a request that Philpotts forward to Maryland a letter (as agreed to on March 28 by telephone) from his bank, stating that $11,000 would be paid on a monthly basis and that sufficient funds would be available to meet Maryland's total bill. Philpotts never returned the notes nor the letter. No part of the sum due Maryland was ever paid.

On March 28, a Creditors' Committee was formed in New York with the consent of Ocean and by agreement between

**3.** As Philpotts on March 16, the day after the Seathunder's arrival in Maryland's yard, had assigned to another any and all monies collectible by him as a result of the arbitration, such a possibility was

non-existent on March 28 but not on February 27. Moreover, inquiry on March 28, might well have caused Maryland to reflect before again relying on Ocean's credit.

various creditors of Ocean and creditors of other Philpotts' companies affiliated with Ocean. A subsequent audit of the financial condition as of March 28 of these companies has been made a part of the record in the instant case. From the audit and other relevant documents it would appear that Ocean from February 27, when O'Hara and Philpotts first discussed credit terms, through March 25, when the work on the Seathunder was completed, was hopelessly insolvent, was completely unable to pay Maryland's bill and that such insolvency and inability to pay should have been known by Philpotts[4] as president of Ocean.

 It is against this factual background that Maryland seeks to assert a maritime lien for damages arising out of tort by amending its intervening libel to allege that the repairs, etc. furnished by it to the vessel at the request of the demise charterer to whom the management of the vessel had been intrusted "were obtained from the intervening libellant by the fraud of the vessel and of the said demise charterer in that, at the time when the vessel and the said demise charterer accepted and received the said materials, supplies, repairs and other necessaries, the vessel and the said demise charterer were unable to pay for the same and had no intention of doing so, and the said demise charterer was insolvent, and such inability to pay and insolvency were fraudulently concealed from the intervening libellant by the vessel and by the said demise charterer." In pressing its claim as one for tort rather than for breach of contract, Maryland contends that two fundamental propositions must be borne in mind; first, that the Maritime Lien Act as codified in Title 46, U.S.C.A. § 971 et seq.[5] has no application whatsoever to

---

4. This conclusion as to Ocean's true financial condition at the time in question is now reached, of course, with the aid of the 20-20 vision of hindsight. Moreover, that Philpotts knew or appreciated the actual financial condition of Ocean is not necessarily established by the record. Maryland's witness, Mr. Carl E. Hammond, who had been appointed by the Creditors' Committee to operate the various affiliated Philpotts' companies, testified that he doubted if Mr. Philpotts sensed the desperate state of affairs even after the Committee took over; that Mr. Philpotts was sincere in his promises but inclined to forget by tomorrow the promises of today; that he was not bad or vicious; that he was skilled in promoting money and that his business was by its nature speculative. For example, during the Suez crisis tanker rates had risen by September 1957 to their highest but by April 1958 they had fallen to an all time low. Place in this situation "an unbounded optimist" (Mr. Hammond's characterization of Philpotts) and you might well have a man who should have known of, but in fact did not realize, his precarious position.

5. The pertinent provisions of the Act in question are as follows:

§ 971.

"Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel. June 5, 1920, c. 250, § 30, Subsec. P, 41 Stat. 1005."

§ 972.

"The following persons shall be presumed to have authority from the owner to procure repairs, supplies, towage, use of dry dock or marine railway, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel. June 5, 1920, c. 250, § 30, Subsec. Q, 41 Stat. 1005."

§ 973.

"The officers and agents of a vessel specified in section 972 of this title shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel; but *nothing in this chapter shall be construed to confer a lien when the furnisher knew, or by exercise of reasonable diligence could have ascertained, that because of the terms of a charter party,* agreement for sale of the

tort liens, and, secondly, that the prohibitory language of the bareboat charter (Maryland assuming without admitting for the purpose of asserting its tort lien that the terms thereof would suffice to prevent the creation of certain types of liens) likewise applies only to contract liens and has no effect upon the creation or enforcement of tort liens. The general principles urged by Maryland are correct. A tort lien is neither created nor authorized by statute, but instead arises under the general maritime law. As is stated in Gilmore and Black, The Law of Admiralty, 1957 Edition, page 527:

> "The Lien Act was not a comprehensive maritime lien statute: it did not entirely repeal the state statutes, it applied to no tort liens and to only some kinds of contract liens."

Nor can the creation of tort liens be prevented by the language of a charter.

> "Most demise charters therefore provide that neither the charterer nor the master shall have the power to create liens on the vessel. This provision is obviously without effect with respect to liens arising by operation of law; liens for crew's wages and salvage are often expressly allowed by the clause, but it is clear that tort liens and general average liens cannot be prevented from coming into being by any documentary manipulation or by

'notice.'" (Gilmore and Black, The Law of Admiralty, 1957 Edition, page 219).

It is argued from these general principles that both the statutory provisions of the Maritime Lien Act and the prohibitory clauses of the charter must be laid aside in the instant case and hence that it follows that Maryland had no duty to inquire as to either the existence, or the terms, of the charter and would not have been bound by them in any event. This conclusion is a non sequitur and is premised upon a boot-strap argument which if adopted would give a repairman who started out solely upon a contractual basis an alternate ground of recovery in tort whenever his bill was uncollectible, which would put him in a better and more preferred position than if there had been a partial performance under the contract. The fallacy of Maryland's argument is further illustrated by the fact that under Maryland's reasoning, while even in the face of total non-payment no contract lien would arise if the repairman knew, *or by the exercise of reasonable diligence,* could have ascertained that the one ordering repairs, etc. was without authority to bind the vessel, nevertheless a preferred tort [6] lien would arise regardless of whether inadvertently, negligently or intentionally the repairman failed to make any inquiry. Granted that there is no duty to inquire as to possible language in a charter prohibiting the creation of liens in cases

---

vessel, or for any other reason, *the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor.* June 5, 1920, c. 250, § 30, Subsec. R, 41 Stat. 1005." (Emphasis supplied.) § 974.

"Nothing in this chapter shall be construed to prevent the furnisher of repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, or the mortgagee, from waiving his right to a lien, or in the case of a preferred mortgage lien, to the preferred status of such lien, at any time by agreement or otherwise; and this chapter shall not be construed to affect the rules of law existing on June 5, 1920, in regard to (1)

the right to proceed against the vessel for advances, (2) laches in the enforcement of liens upon vessels, (3) the right to proceed in personam, (4) the rank of preferred maritime liens among themselves, or (5) priorities between maritime liens and mortgages, other than preferred mortgages, upon vessels of the United States. June 5, 1920, c. 250, § 30, Subsec. S, 41 Stat. 1005."

6. "Preferred" is here used in the sense that, in the marshalling of maritime liens, tort liens usually rank contract liens (Todd Shipyards Corporation v. City of Athens, D.C.Md.1949, 83 F.Supp. 67, 79; See also: S.Rep. 1213, 83d Cong., 2d Sess. page 4—citing the City of Athens with approval).

where a tort lien is asserted for damages arising out of a collision or for personal injuries, the present lien allegedly arises due to a specific type of tort-fraud. Assume arguendo such a maritime tort claim in rem might be maintained under appropriate circumstances. Nevertheless, in considering the possibility of the existence of a duty to inquire as to the vessel's ability to bind herself to pay for repairs, a case where the tortious conduct relied upon as allegedly giving rise to the lien is the vessel's fraudulent concealment of her inability to pay is obviously quite different, and must be distinguished, from a collision, conversion or personal injury case. One of the elements necessary to establish fraud is justifiable reliance, here justifiable reliance by Maryland upon the Seathunder's ability to pay. One alleging fraud cannot close his eyes to avoid discovery of the truth and still prevail.

██ In the instant case the testimony is that Maryland through May and O'Hara knew before the Seathunder came into dry dock and knew through its estimator, Mr. Horvatt, within twenty-four hours after the vessel's arrival, that Ocean did not own her but merely had her under charter. It is common knowledge that most demise charters prohibit the creation of liens for repairs. Thus Maryland knew, or should have known, of the possibility of the vessel's inability to pay. In addition Maryland was on notice as to Ocean's probably insecure financial situation. Maryland's credit department on February 11, prior to O'Hara's initial contact with Philpotts on February 27, questioned extending further credit to Ocean in view of the unpaid balance due for over one year on the S. S. Franco Lisi, a balance which Maryland would normally have expected to receive within thirty days, or, if it were dealing with a major company, no later than ninety days after such balance came due. Also of significance is that on February 27, Philpotts declined to give O'Hara his financial statements and bank statements and that the confessed judgment notes requested by Maryland on March 11 as security were never executed. There were other indications of Ocean's and the vessel's inability to pay which have been previously mentioned and need not be reiterated. These indicia as to the true situation taken together clearly evidence, the Maritime Lien Act and the charter provisions aside, that ordinary business prudence dictated an inquiry on the part of Maryland. It has been stipulated that the master of the Seathunder if called as a witness would testify that such an inquiry, if initiated, would have resulted in the exhibition by him of the charter to Maryland.

██ A second element necessary to establish fraud is a material misrepresentation or a fraudulent concealment. In its amended intervening libel Maryland relies upon the latter. Under the facts neither exists on the part of the vessel. Even if it were held that the conduct of Philpotts as president of Ocean amounted to a fraudulent concealment of Ocean's insolvency and its inability to pay, this constitutes nothing more than a personal fraud on his or Ocean's part. Both the pleadings and the evidence support this conclusion. Half of the pertinent paragraph of the amended intervening libel alleging fraud relates to the fraud of the demise charterer, Ocean, and not to fraud of the vessel. Moreover, all of the correspondence and the testimony is as to a reliance by Maryland upon Ocean's personal ability to meet Maryland's charges; i. e., the tying in of the payment on the Franco Lisi with the acceptance of the work of the Seathunder; the proposition to take notes, first $6,500 monthly and then $11,000 monthly; Philpotts' very gracious letter, previously quoted, thanking Maryland for its extension of credit arrangements to Ocean; and O'Hara's statement that he made no inquiry as to the value of the vessel as he never expected that he would ever have to execute on her. All of these facts point to a purely personal contractual undertaking and, therefore, if a fraud was perpetrated, it was a purely personal fraud.

Where the fraud is of a personal nature, a claim for damages arising out of that fraud cannot and does not constitute a lien upon or claim against the vessel. International Refugee Organization v. Maryland Drydock Company, 4 Cir. 1950, 179 F.2d 284, 288; Atlantic Steamer Supply Company v. The S. S. Tradewind, D.C.Md.1957, 153 F.Supp. 354, 357.

■ A corollary to the conclusion under the facts just recited to establish that the fraud, if any, was clearly a personal one is that if Maryland was ever in a position to assert a lien against the vessel, it waived its right to do so by relying *solely* upon the personal credit of Ocean. The court is well aware of the myriad of cases holding that credit may be extended to the owner or charterer without that fact alone constituting a waiver of a lien against the vessel and that the acceptance of notes where it is expressly stated that liens are not thereby waived likewise does not evidence a waiver (e. g., See: The Marsodak, 4 Cir. 1938, 94 F.2d 339, 342). However, where repairs, supplies or other necessaries are furnished on the credit of the owner, or charterer, alone "it cannot be doubted that * * * no lien exists. If this be correct, it would follow, necessarily, that a decision of the question depends upon the facts." The Defiance, D.C.E.D.N.C.1924, 3 F.2d 48, 51. The import of the facts, to this court, is that Maryland relied solely on the credit of the charterer and not of the vessel. It should be remembered that the notes sent to Philpotts immediately after the arrival of the Seathunder in Maryland's yard expressly reserved any lien Maryland might havè had against the vessel. These notes were never executed yet Maryland proceeded with the work contracted for. The court rejects Maryland's contention that this shows more clearly reliance on the vessel, and instead concludes in view of all of the attendant circumstances that such a manner of conducting business evidences that Maryland was relying solely on Ocean's credit and thus knowingly waived any right it might have to assert either a tort or contract lien against the Seathunder.

■■ Finally the one overriding reason that Maryland cannot assert a tort claim for fraud against the Seathunder is that there was no misrepresentation or fraudulent concealment by the vessel as to her inability to pay for the repairs furnished to her. At all times there was on board the vessel among the ship's papers in the master's desk a certified copy of the bareboat charter which would have been exhibited to anyone wishing to see it. The Henry W. Breyer, D.C.D.Md. 1927, 17 F.2d 423, 431, principally relied upon by Maryland is factually distinguishable from the present case where no question of cargo or of fraud on the part of the vessel owner is involved, but only Maryland's right to a lien for repairs ordered by the demise charterer when the charter prohibited the imposition of liens and Maryland knew the vessel was under charter. The court finds the facts in the case at bar more nearly analogous to those recited in its decision in Atlantic Steamer Supply Company v. The S. S. Tradewind, D.C.D.Md.1957, 153 F.Supp. 354 relative to the claim of the W. Harry Smith Agencies, Inc. to a preferred maritime lien for damages arising out of tort. Assuming that a ship can herself be guilty of fraud by accepting repairs when the charterer (not the owner) which ordered the repairs was insolvent and unable to pay for them at the time they were ordered, the fact remains that in the case of The Seathunder, as in the case of The Tradewind, the ship herself gave notice that her credit could not be pledged for the payment of the repairs. In The Tradewind there was a preferred mortgage, while in The Seathunder there was a bareboat charter on board the vessel which prohibited the imposition of any maritime lien, except for crew's wages and salvage. There is no suggestion that Preston knew of Ocean's precarious financial condition or in any way misled Maryland. Actually, Preston had no knowledge of Ocean's true financial con-

dition. In The Tradewind the furnisher was charged by statute with notice of a valid preferred mortgage on the vessel. In the instant case Maryland had actual notice of the existence of the charter. Accepting for the moment Maryland's contention that there was no duty imposed upon it by statute to inquire as to the terms of the charter and even though knowledge that a vessel is under charter may not be the equivalent of actual knowledge that the charterer has no authority to incur liens, knowledge of the existence of a charter coupled with the fact that it is common knowledge that the usual practice is to include in charters terms prohibiting the creation of liens, required Maryland to use reasonable diligence to ascertain the terms of the charter. In the absence of such an inquiry, Maryland cannot under the facts of this case prove a misrepresentation or a fraudulent concealment by the Seathunder.

As an alternative ground for recovery Maryland takes the position that should it not have a tort lien at least it has a contract lien. The argument is advanced that Ocean, although in form a charterer, for all practical purposes was the owner of the vessel and thus any agreement by Ocean not to incur liens was nugatory. Authority for this particular argument is based primarily upon the following dictum of Chief Justice Hughes in Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 1940, 310 U.S. 268, 278, 60 S.Ct. 937, 942, 84 L.Ed. 1197:

> "There is a plain distinction between a case of a bare-boat charter, where the charterer mans the vessel, and a case where the charter party is a mere contract for the carriage of goods."

In addition Maryland cites Reed v. United States, 1871, 11 Wall. 591, 78 U.S. 591, 601, 20 L.Ed. 220; Leary v. United States, 1872, 14 Wall. 607, 81 U.S. 607, 610, 20 L.Ed. 756; United States v. Shea, 1894, 152 U.S. 178, 189, 190, 14 S.Ct. 519, 38 L.Ed. 403, as stating that a bareboat charterer is for all intents and purposes an owner. Maryland contends moreover that factual support for its position is found in that article 14 of the charter party shows that Ocean had every interest of an owner except technical legal title and that under the circumstances Preston had no interest whatsoever in the Seathunder after April 11, 1956, except to receive a check for the charter hire once each month.

■ An examination of the charter indicates that Article 14 of the charter party merely contains the usual language necessary to create a bareboat charter and that Preston as general owner had all the interest in the Seathunder of such a general owner and protected and reserved such interest in various articles of the charter—to name a few, Article 2 designates and limits the types of trade in which the Seathunder could engage; Article 7 requires the charterer to make special surveys and do the repair work indicated thereby; Article 11 provides that the charterer should at all times maintain the Seathunder in a good state of repair and seaworthy condition and prohibits the charterer from making any structural change in the vessel or her appurtenances. Other articles spell out the charterer's duty to dry dock the vessel; to allow the owner the right to inspect the vessel and her logs; to furnish information to the owner regarding any accidents to the vessel; to carry and maintain insurance on the vessel, losses under such insurance to be paid to the owner; and to redeliver the vessel in the same condition as required by the American Bureau of Shipping classification under which she was delivered. These provisions indicate that in substance as well as form Ocean was a bareboat charterer and that Preston was the owner. The Supreme Court cases of Reed, supra, 11 Wall. 591, 601, 78 U.S. 591, 601; Leary, supra, 14 Wall. 607, 610, 81 U.S. 607, 610 and Shea, supra, 152 U.S. 178, 189, 190, 14 S.Ct. 519 relied upon by Maryland for the general proposition that a bareboat charterer is an owner are inapposite. In only one of the cases, Shea, was a bareboat charter found

to exist. All of the suits were brought in personam by general owners against charterers, not as here, by third parties against the vessel to assert a claim in rem for liens allegedly incurred by the charterer, not the owner. Accordingly, irrespective of the general language of these decisions the question in each instance before the Supreme Court was whether or not, due to the nature of the respective undertakings of the parties to the charter, the charterer was clothed with the character or legal responsibility of ownership vis a vis the general owner. These opinions do not touch upon the issue presently before this court, i. e., can a general owner prohibit by the terms of a bareboat charter the creation of contract liens against a vessel by the party intrusted with the sole command, possession and control of the vessel during the duration of the charter, whether that party be denominated a "charterer" or a "special owner". The Supreme Court case of Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., supra, 310 U.S. 268, 60 S.Ct. 937, principally depended upon by Maryland, points the way to the conclusion that the general owner is entitled to, and can easily, prohibit the creation of such liens. Although the Signal Oil case involved time charters, the provisions of which the Supreme Court held did not prohibit contract liens, the Supreme Court stated:

> "* * * The owner has a simple and ready means of protection. All that it is necessary for him to do, as the material-man in dealing with the charterer is charged with notice of the charter, is to provide therein that the creation of maritime liens is prohibited. When the owner does not do so, he should not be heard to complain when it appears that it is the charterer's business to obtain supplies to keep the vessel on her

way and the charter has not prohibited reliance upon the credit of the vessel." 310 U.S. at pages 280–281, 60 S.Ct. at page 943, emphasis supplied.

Earlier in The South Coast, 1920, 251 U.S. 519, 523, 40 S.Ct. 233, 64 L.Ed. 386, the authority of the owner of a demised vessel [7] to prohibit the creation of liens against the vessel had been specifically recognized, the holding of the case being that the owner had failed to exercise his authority. Later in distinguishing the language of the charter party involved in the South Coast opinion from that in the case then before it, in United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361, a direct holding by the Supreme Court that the owner of a demised vessel may through the use of the proper terminology prohibit the creation of contract liens against the vessel by the bareboat charterer finally resulted.

■ Maryland attempts to distinguish the Carver case on several grounds. First, it is urged that the validity of Carver has been "questionable since the dictum in the Signal Oil case, 310 U.S. at page 278, [60 S.Ct. at page 942], pointing out the 'plain distinction' between the bareboat charter and a time charter." There is no such dictum in the Signal Oil case. What the Supreme Court said was:

> "* * * There is a plain distinction between a case of a bareboat charter, where the charterer mans the vessel, and a case where the charter party is a mere contract for the carriage of goods.[8] In the former there is a clear demise; in the latter, the charterer is in substance only a shipper. *There is an intermediate class of charters which has given rise to many ques-*

---

7. Maryland in its pretrial memorandum refers to the South Coast case as involving a time charter. The Supreme Court decision states the charter in issue was a bareboat charter. See also: The

Signal Oil case, supra, 310 U.S. 268, 274, 60 S.Ct. 937—to the same effect.

8. The court in the latter case was speaking of the "voyage" charter, not a time charter. See: Gilmore & Black, The Law of Admiralty, page 565.

*tions in various situations. Time charters of the sort now before us are in this class.* The owner provides the master and crew and undertakes the navigation of the vessel and to maintain her in an efficient condition. But the master although appointed by the owner, is placed 'under the orders and direction of the charterers as regards employment or agency.' * * *

"There is thus a distribution of responsibility, and liability or the legal consequences of particular conduct would be determined accordingly. * * *

"The question whether under a charter, containing these or similar provisions, the materialman may have a lien for supplies furnished on the order of the charterer has given rise to conflicting views and no little confusion has resulted.

"We think that this conflict may be resolved by having due regard to the manifest purpose of the governing statute. *The Act says nothing about types of charters.*" (The Signal Oil case, supra, 310 U.S. at pages 278, 279, 60 S.Ct. at page 942—emphasis supplied.)

While it is true that the Act was passed primarily to restrict the rights of vessel owners and to protect the materialman, *section 973 of Title 46 U.S.C.A. creates an exception in favor of the vessel owner,* an exception specifically recognized in The Signal Oil case, supra, 310 U.S. at page 273, 60 S.Ct. at page 940. As in that same opinion the Supreme Court construed the Maritime Lien Act for the purpose of applying the statutory test of authority to pledge the credit of the vessel as not differentiating between types of charters where management of the vessel is thereby intrusted to the charterer, this court concludes that the qualification of the broad language of the Act by section 973 runs in favor of the vessel owner whether the vessel is under a bareboat or a time charter.

It is next suggested that the effect of the Carver decision should be limited to bareboat charters (1) of short duration, (2) where the bareboat charterer is not the "economic owner" of the vessel, and (3) where the general owner has not recovered more than its original investment with interest. Economic ownership of the Seathunder by Ocean in the instant case allegedly arises because the Delhi-Taylor Oil Corporation (Preston's parent) purchased the Seathunder on April 4, 1952, from Colonial Steamship Corporation (Colonial) for $3,150,000. The vessel was then chartered back under bareboat charter to Colonial from that date until October 5, 1953, for which Delhi-Taylor received $1,800,000. Thereafter, on October 6, 1953, the vessel was transferred to Delhi-Taylor's subsidiary, Preston. From October 6, 1953 until April 4, 1956, she was on a bareboat charter to Colonial from which Preston received $1,593,000 making a total of $3,393,000 received from Colonial in charter hire. The charter from Preston to Ocean, executed on April 6, 1956, was for a period of ten years during which time it was contemplated that Preston would receive from Ocean sums totaling $3,012,840 in charter hire. The argument is advanced, that since the charter hire received from Colonial plus that contemplated as eventually to be received from Ocean would total $6,405,-840, Ocean thereby became the "economic" owner of the Seathunder. Factually, and as a matter of law, this argument is without support. There is no logic in adding the charter hire received from Colonial to that contemplated to be received from Ocean to establish *Ocean's* economic ownership of the vessel. The sums Preston was to receive from Ocean over a ten year period are irrelevant when, as a matter of fact, the charter party did not run for ten years but instead was cancelled by mutual agreement on November 19, 1958, approximately only two and one-half years after its execution. No authorities have been cited to the court in support of Maryland's position nor has the court found

any through its own research. No standards have been suggested for determining at what point a charter of short duration merges into one of long duration; when and how precisely "economic" ownership arises or how much of a profit is sufficient to strip an owner of his power to prohibit a charterer from creating valid liens against the vessel. Thus, Maryland's position, if sound, would again involve the courts in that Serbonian Bog [9] to which Robinson on Admiralty, page 373, refers and from which he states that the courts were partially rescued by the passage of the Federal Maritime Lien Act. In the view that this court takes,[10] the provisions of the Act and the decisions construing the Act prevent the recurrence of such an involvement. "The Act says nothing about types of charters" (The Signal Oil case, supra, 310 U.S. at page 279, 60 S.Ct. at page 943). It does not differentiate between them on grounds of short or long duration. It makes no mention of "economic ownership" nor does it, having carved out an exception in favor of the recorded holder of title, specify that the exception no longer applies if the title holder has recovered its initial investment with interest. None of these alleged distinguishing factors can be read into the Federal Maritime Lien Act.

The three Supreme Court decisions previously discussed (The South Coast, United States v. Carver and The Signal Oil case) all recognize the general principle that the owner has authority to prohibit, by the terms of a charter, a charterer from creating liens against the vessel. These decisions, and specifically the Carver case, have been followed and relied upon by this District and the Court of Appeals for the Fourth Circuit without any suggestion of the qualifications intervening libelant would now have applied to the Carver opinion (See: Old Dominion S. S. Company v. United States, D.C.D.Md.1924, 297 F. 534—an opinion by Judge Soper, affirmed per curiam on the authority of United States v. Carver, and of three other decisions of the Fourth Circuit, 4 Cir., 1925, 3 F. 2d 1021; The Chester, D.C.D.Md.1928, 25 F.2d 908, 909; The Ascutney, 4 Cir., 1923, 289 F. 802, 803).

 That Congress never intended the word "owner" as used in the Maritime Lien Act, reenacted in 1920 as part of the Ship Mortgage Act, to extend to an equitable owner or an alleged "economic" owner is evidenced by the history of the Ship Mortgage Act of 1920. The Act was passed to encourage investment in domestic vessels by affording better mortgage security. This purpose can best, if not only, be effectuated by con-

9. "A gulf profound as that Serbonian Bog
Betwixt Damiata and Mount Cassius old,
Where armies whole have sunk."
Milton, Paradise Lost, II.

10. The possibility of a divergency of opinion among the courts as to the correct solution of the problem is suggested by the following excerpts from Gilmore & Black, The Law of Admiralty, pages 561–564:

"Since the passage of the Lien Act the Supreme Court has decided three cases on the subject of the materialman's duty of inquiry and the effect of charter party provisions which limit the charterer's power to create liens. The first two, The South Coast and U. S. v. Carver both opinions by Justice Holmes, have been widely regarded as irreconcilable. The third, Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., opinion by Chief Justice Hughes, reaffirmed both the earlier cases."

* * * * *

"Like baseball players and law book writers, judges have their off days, and the day when Justice Holmes wrote his Carver opinion was one of his worst."

* * * * *

"Both the South Coast charter and the Carver charter required the charterer to 'provide and pay for' supplies, and thus were of the same general type as the charters which the Court had analyzed in The Kate and The Valencia. But, under the Carver opinion, one charter prohibited liens and the other authorized them. Thus the lower courts were invited to engage in word-chopping games.

"For nearly twenty years the District and Circuit courts continued to debate the distinction between The South Coast and Carver, with Carver on the whole in the ascendant."

struing "owner" as being limited solely to the holder of recorded title. Judge J. Skelly Wright in analyzing the Act made the following pertinent comments:

" * * * Under the Act, the maritime ship mortgage, with certain exceptions, protects the investor against all maritime liens subsequently attached. The Act goes further, however. It protects the maritime ship mortgage against prior obligations resulting from repairs or supplies to the vessel unless those repairs or supplies were authorized by her owner. The Act provides the means by which an owner may charter his vessel and prohibit the attachment of liens by the charterer. In this way an investor requiring a ship mortgage may accept with assurance the owner's certificate that no prior maritime liens have attached, at least during the pendency of the charter. *Consequently, if an investor is to be given the protection intended by Congress, he should be allowed to proceed with confidence on the recorded ship's documents.* He should not be required to guess who the equitable owner of the vessel may be. *He should be able to rely, as to ownership at least, on the title which is recorded* with the Collector of Customs as required by law.

" * * * It is true that the shipyard here may also have been victimized by these putative owners. But if the shipyard had used the reasonable diligence required by the Act, it would have learned, in advance of the repairs, that the vessel would not be bound therefor." First National Bank & Trust Co. of Vicksburg, Miss. v. The Towboat Seneca, D.C.E.D.D.La.1960, 179 F.Supp. 847, 850, 851—emphasis supplied.

In like manner in the instant case, there being neither factual grounds nor statutory or judicial authority for distinguishing the Carver decision, Maryland must bear the risk of non-inquiry. To hold otherwise would be to subvert the purpose of the Ship Mortgage Act and the purpose of the exception in the Lien Act in favor of the vessel owner for "the plastering of a vessel with liens is just as definite a diminution in her value as is physical damage, and the owner wants to make the charterer pay as he goes, and not conduct operations on the credit of the vessel." Gilmore & Black, The Law of Admiralty, page 219.

Maryland's remaining contentions as to why Carver is not controlling in this case may be disposed of without extended discussion. Carver involved supplies and the present case involves repairs. It is suggested that as supplies may be furnished on a C.O.D. basis while in the case of repairs prices often cannot be set in advance, there is no inconsistency in a prohibition of lien clause relative to supplies but that in the case of repairs maritime liens must come into existence or else the ship simply cannot be repaired. It is of no concern to the repairman whether or not the vessel will be forced to be laid up but he would be well advised, if he intends to assert a lien against the vessel for repairs, to make it his concern to inquire as to the ability of the vessel to be bound therefor. The governing statute is explicit. Section 973, placing the burden of inquiry on the one dealing with the vessel, speaks of repairs and supplies in the same breath. A prohibition of lien clause clearly applies with equal force to "repairs, supplies, or other necessaries".

In the instant case the owner required the charterer to make repairs (Articles 7, 11, 12, 13, 14 and 15 of the charter party). The court finds no inconsistency or ambiguity between these requirements and the provisions of Article 19 of the charter party, which was quoted at the beginning of this opinion, and is the provision of the charter party containing the prohibition of lien clause. Indeed, Article 19 is necessary because of the very fact that the charterer was required to repair the vessel.

Article 19 of the charter party is captioned "Libels". Subsection (a) thereun-

der prohibits the creating, incurring or permitting to be placed upon the vessel any lien whatsoever other than for crew's wages or salvage. Subsection (b) of Article 19 provides inter alia that if a libel should be filed against the vessel the charterer shall, at its own expense, within ten days thereafter cause the vessel to be released and the lien to be discharged. It is argued that the captioning of Article 19 sets up an ambiguity which Maryland, had it made inquiry as to the provisions of the charter, could not possibly have resolved. The court finds no such ambiguity. Most importantly as a matter of substance, the undertaking spelled out in the body of Article 19 is directly and clearly in line with that in the Carver case. "Here the primary undertaking was that 'the charterers will not suffer nor permit to be continued any lien,' etc. We read this as meaning will not suffer any lien nor permit the same to be continued. Naturally there are provisions for the removal of the lien if in spite of the primary undertaking one is imposed or claimed. But the primary undertaking is that a lien shall not be imposed." 260 U.S. at pages 489–490, 43 S.Ct. at page 182. With respect to the argument that, as a matter of form, Article 19 to be unequivocal should have been entitled either "Liens" or "Liens and Libels" and also with respect to the contention that the provisions requiring the charterer to make repairs create ambiguities, it should be noted that the standard forms of bareboat charter authorized by the Federal Maritime Board contain substantially similar requirements as to a charterer's duty to repair, and clause 20 of said forms containing the prohibition of lien provision is, as in the instant case, captioned "Libels" (See 46 C.F.R., 1946 Supp.; sec. 302.62a; 46 C.F.R. 1958 Rev., sec. 299.130).

The requirement in Article 19 (a) of the charter that the charterer "will exhibit" the charter to any person having business with the vessel and also exhibit the same to any representative of the owner on demand does not override or repeal the statutory duty of inquiry placed upon the repairman.[11] As was said by the Supreme Court in the Carver case "We regard these words as too plain for argument. *They do not allow the materialman to rest upon presumptions until he is put upon inquiry, they call upon him to inquire.* To ascertain is to find out by investigation. If by investigation with reasonable diligence the material-man could have found out that the vessel was under charter, he was chargeable with notice that there was a charter; if in the same way he could have found out its terms he was chargeable with notice of its terms." (260 U.S. 482, 489, 43 S.Ct. 181, 182; Tampa Ship Repair and Dry Dock Company, Inc. v. Esso Export Corporation, 5 Cir., 1956, 237 F.2d 506, 507–508.)

Although Preston knew through its proctor, Mr. Estabrook, who was handling the arbitration proceedings that the Seathunder had from time to time been in various yards along the coast, it was

11. A somewhat analogous situation arises in the case of preferred ship mortgages where by statute, not by private agreement, a mortgagor is required to place a copy of the mortgage on board the vessel and to *"cause such copy * * * to be exhibited by the master* to any person having business with the vessel * * *"* (Title 46, § 923—emphasis supplied). In harmonizing this statutory provision with section 973 of Title 46, the statutory duty of inquiry placed upon the repairman by the latter section has consistently been held to be the primary and controlling duty since The Oconee, D.C.E.D.Va.1922, 280 F. 927, 933–934, and for the reason stated therein. See also Pascagoula Dock Station v. Merchants & Marine Bank, 5 Cir., 1959, 271 F.2d 53 in which the court rejected a claim that a preferred ship mortgage was invalid because the mortgagee bank did not insure that suitable notice of said mortgage was given by saying at page 55 a "certified copy of preferred ship mortgage was on board. It was hardly where it could be of ready use and its place of safekeeping deprived it of much notice. But it was there—safely and securely under the captain's mattress."

not until March 26, 1958 that Preston had its first intimation that Ocean was in financial difficulty. Prior thereto on February 28, 1958, Preston had been assured by Marine Midland Trust Company, which in effect had control of the affiliated Philpotts' Companies through a series of assignments, escrow agreements, loan agreements, etc., that Ocean's credit was good. Stanford Trust Company had reported favorably on Philpotts individually. Preston therefore had no reason to know that repairs were to be made to the Seathunder for which Maryland would not be paid, and consequently under no circumstances was there bad faith on Preston's part or a duty to warn Maryland of facts of which Preston itself had no knowledge.

A substantial part of the repair work done to the Seathunder was of a permanent nature. It was estimated that the cargo piping and heating coils installed by Maryland would last five to ten years and that some of the major electrical renewals would last for the life of the vessel. Preston got its ship back, fully repaired, within a few months after the work was done. Maryland contends that in such a case to deny it a lien is inequitable and will result in an unjust enrichment of Preston. This argument has been made before to this court to no avail (Atlantic Steamer Supply Company v. The S. S. Tradewind, D.C.D.Md.1957, 153 F.Supp. 354, 361). At first glance it is an appealing approach but in a balancing of the equities it should be remembered with what ease Maryland could have ascertained the existence of the prohibition of lien clause and that it was Maryland's statutory duty to make inquiries while Preston had no way other than by the terms of the charter party to prevent the creation of liens against its vessel for repairs.[12] There was evidence that most of these repairs were essential but some of the electrical repairs were more extensive than necessary to meet bare minimum requirements. Perhaps Preston would have preferred to conduct a shoe-string operation or no operation at all. If Preston was enriched it was enriched against its will as it did all that it could to prevent such an occurrence; Maryland did nothing. If on the facts of this case Maryland were to prevail under the theory of unjust enrichment, then unjust enrichment would be the complete answer for every materialman having a claim not otherwise assertible as a lien. " * * * There must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine." 91 C.J.S. Unjust Enrichment page 490. The statutory requirement of inquiry as to the vessel's ability to be bound for repairs made to her cannot be circumvented by resorting to the doctrine of unjust enrichment. "Services rendered to a person against his will and without his assent, or against his express commands, * * * cannot be recovered for by the person rendering them, however valuable the services may be." 98 C.J.S. Work and Labor § 10b., page 733. This court concludes that the Carver decision is controlling and that Maryland more than having failed to exercise reasonable diligence—indeed having chosen to shut its eyes to the true situation—must bear the loss.

Claim of Atlantic Cordage and Supply Corporation (Atlantic Cordage).

Atlantic Cordage's original intervening libel alleged that on or about March 6, 1958, while the Seathunder was at the port of Port Newark, Newark, New Jersey, said intervening libelant furnished to the vessel upon the order of a duly authorized agent of the owner of the vessel certain materials, supplies and equipment consisting principally of steel wire rope and manila rope of the reasonable and agreed value of $1,504.19.[13] Subse-

---

12. The South Coast, 1920, 251 U.S. 516, 522–523, 40 S.Ct. 233, 64 L.Ed. 386.

13. Preston, the owner and claimant of the Seathunder, does not contest that the supplies constituted "necessaries" within the meaning of the Maritime Lien Act; that they were delivered to the vessel, and that the charge made for them is reasonable.

quently, the intervening libel was amended to allege in addition as a "Second (Alternative) Cause of Action" that the supplies, etc. were obtained by fraud of the vessel, her owners and the persons in charge of her in that at the time when the Seathunder and those in charge accepted and received the materials, supplies and equipment in question the vessel and said persons were unable to pay for the same and had no intention of doing so, such inability to pay and insolvency being fraudulently concealed from the intervening libelant by the vessel and those in charge of her.

■■■ Atlantic Cordage's first cause of action is based upon the premise that it was not dealing with Ocean, the charterer, or with the master of the Seathunder but with an agent of the vessel's owner and, accordingly, section 973 of Title 46, and any prohibitory language contained in the charter party relative to the creation of liens are extraneous to the issues presently before the court. True, the supplies in question were ordered by Philpotts Shipping Agency, Inc., but Atlantic Cordage produced no competent evidence to support its contention that Philpotts Shipping Agency, Inc. in so doing acted as a duly authorized agent for Preston. To establish an agency relationship between Preston and Philpotts Shipping Agency, Inc., Atlantic Cordage relied upon a provision in the charter party requiring the payment by Preston to Philpotts Shipping Agency, Inc. of a commission calculated on the basis of a percentage of the actual amount of the

charter hire when and as the charter hire was received. This provision merely evidences that Philpotts Shipping Agency, Inc. had acted as a broker in the procurement of the charter party between Preston and Ocean. It does not indicate for whom Philpotts Shipping Agency, Inc. acted at that time, whether for Preston or Ocean or both. Nor does it indicate that, having procured the charter, Philpotts Shipping Agency, Inc. thereafter acted or had authority to act in any manner as Preston's agent. Mr. Hammond of the Creditors' Committee testified that the owner of a chartered vessel customarily pays the brokerage fee regardless of whose agent the broker is and that in the instant case there was, as a matter of fact, after the procurement of the charter party no continuing high level relationship between Preston and Philpotts Shipping Agency, Inc. Accordingly, this court finds as a matter of fact that Philpotts Shipping Agency, Inc., was not, as alleged, a duly authorized agent of Preston. Although, of course, Atlantic Cordage is not bound by the stipulations entered into between various other intervening libelants, such stipulations do support the court's conclusion as to lack of an agency relationship between Preston and Philpotts Shipping Agency, Inc. and distinctly indicate that Philpotts Shipping Agency, Inc. was in all instances acting for Ocean, not Preston.[14]

■■■ Thus, Atlantic Cordage is met, as Maryland was, with the necessity of showing an exercise of reasonable dili-

---

14. "A. T. Philpotts, Jr., and A. T. Philpotts, Sr., were at all relevant times the sole stockholders of Merchants Shipping and Trading Company, S. A. ('Merchants'), a Panamanian corporation. A. T. Philpotts, Sr. and Merchants were the sole stockholders of Philpotts Shipping Agency, Inc. ('Agency'), a Delaware corporation. Merchants also owned 49 per cent of the capital stock of Ocean. The remaining 51 per cent was owned by W. S. Kies & Company, a partnership. Ocean owned all of the stock of Fleet Operators, Ltd., Inc. ('Fleet'), a Liberian corporation. A. T. Philpotts, Jr. was President and a director (?) [sic] of Merchants, Ocean, Fleet and Agency.

\* \* \* \* \*

"At the time the Seathunder was delivered to Ocean under the charter, Ocean's agents were Phs Van Ommeren Shipping U.S.A., Inc. ('Van Ommeren'). This company continued to act as agent for Ocean until November 31, 1956. On November 1 [sic], 1956 Agency became the agents for Ocean and were agents for that company thereafter.

"There was no corporate relationship whatsoever between Preston and Ocean or between Preston and Agency or between Preston and Van Ommeren."

(Quoting in part from stipulation of facts between Maryland and Preston).

gence in ascertaining the extent of the authority of the one ordering the supplies to bind the vessel therefor. Testimony offered by intervening libelant was to the effect that Atlantic Cordage, through its salesman William B. Hawley, dealt with Mr. Haller who was acting as a representative of Philpotts Shipping Agency, Inc. The supplies were invoiced to the "SS Sea Thunder and/or Owners, Philpotts Shipping Agency, Inc., 24 State Street, New York, N. Y." Mr. Hawley knew that the Philpotts Shipping Agency, Inc. was operating a number of ships, that the port agent or operating manager for Philpotts Shipping Agency, Inc. was Hutchinson and that the Seathunder was coming into port to prepare for a long term charter. The vessel first docked at Newark where Hawley met with Haller and also talked with the chief mate relative to the type of rope required. Thereafter Hawley spent two days in Baltimore measuring the rigging. At no time did he inquire as to who owned the vessel or for whom Philpotts Shipping Agency, Inc. was acting. Upon these facts, and for the same reasons previously stated in detail in discussing Maryland's intervening libel, the court concludes that both causes of action asserted by Atlantic Cordage must fail.

### Claim of Dalzell Towing Company, Inc. and Robert A. Aikman, Agent (Dalzell Pilots)

This intervening libel claims $6,169.04, plus interest for tug boat service furnished to the Seathunder at the port of New York for the years 1957 and 1958 and $645 together with interest for pilotage of the vessel during the same years. There is no contest as to the justification and reasonableness of the charges or of the services performed by intervening libelants. Mr. Dalzell of the Dalzell Towing Company, Inc. testified that he had heard through a trade paper that Philpotts Shipping Agency, Inc. was securing four vessels to operate in and out of the

port of New York. Accordingly, he contacted Philpotts Shipping Agency, Inc. to obtain a towage contract. The contracts, introduced into evidence, show that Dalzell and the Dalzell pilots agreed to furnish the necessary towing and pilotage for all vessels *owned or operated* by Philpotts Shipping Agency, Inc. and/or Ocean. Thus these intervening libelants were on notice that some of the vessels to which they rendered service might not be owned by Philpotts Shipping Agency, Inc. or Ocean, but would be under charter. Such was the case with the Seathunder and again intervening libelants failed to initiate any inquiry as to the authority of Philpotts Shipping Agency, Inc. or Ocean to bind the vessel.

However, intervening libelants contend that section 973 of Title 46 is not applicable to towage and pilotage claims, pointing to the fact that all sections of the Maritime Lien Act with the exception of section 973 refer specifically to towage but that section 973 placing the duty of inquiry upon the furnisher speaks only of "repairs, supplies, or other necessaries". Because of this, it is argued that the Maritime Lien Act would render nugatory any terms of a charter party which attempted to prohibit the creation of liens for the furnishing of towage or pilotage.[15] This argument completely overlooks the history of the judicial construction of the Maritime Lien Act and the reason for the 1920 amendment thereof. Prior to 1920, those courts which narrowly construed the Lien Act held it inapplicable to claims arising out of towage, pilotage, stevedoring and similar services; leaving such claims to be governed by general Maritime Law. Congress, dissatisfied with such a restrictive construction, in 1920 amended the Act by adding the word "towage" and causing the reference to "dry dock or marine railway" to precede rather than follow "other necessaries". As explained by Gilmore and Black, The Law of Admiralty, page 542:

---

15. This contention, even were it otherwise valid, would not be pertinent with respect to the pilotage claims.

"On the level of statutory construction the narrow reading of the 1910 Act had represented an application of the *eiusdem generis* rule: 'other necessaries' included only things of the same kind as 'repairs and supplies', not including even things 'like' 'dry dock or marine railway' since those were referred to in a phrase which followed and therefore could not qualify or add to 'other necessaries'. Applying the same *eiusdem generis* rule of construction, the addition of 'towage' and the shift of the position of the 'dry dock or marine railway' reference necessarily broadened the scope of 'other necessaries' to include things 'like' the three new antecedents."

Thus, nearly every service which is "convenient, useful and at times necessary" was brought within the ambit of the Lien Act (Gilmore and Black, op. cit., page 543). Section 973, a part of that Act, requires reasonable diligence on the part of the furnisher to ascertain that the one ordering the necessaries has authority to bind the vessel. Towage and pilotage are clearly included within the meaning of "necessaries" as that term is used in section 973. Authority for the conclusion that section 973 applies with equal force to towage as to repairs, supplies or other necessaries is to be found in United States v. Daniels Towing and Drydock, Inc., 5 Cir., 1954, 214 F.2d 501, 503; Dalzell Towing Company, Inc. v. J. W. Hennessy, Inc., 2 Cir., 1932, 57 F.2d 77, 78–79. The court finds that intervening libelants have failed to exercise reasonable diligence in inquiring as to the authority of Philpotts Shipping Agency, Inc. or of Ocean to bind the Seathunder and, accordingly, their intervening libel should be dismissed.

Claim of Charles F. Hughes t/a Vane Brothers Company.

█ This intervening libel claims $992.08 for certain food stuffs, steward department sundries and deck supplies furnished to the Seathunder between March 18, 1958 and April 14, 1958, while the vessel was still in the yard of Maryland. In its pretrial memorandum Preston urged that in no event should maritime liens be allowed for supplies furnished after March 27, 1958, relying on Vlavianos v. The Cypress, 4 Cir., 1948, 171 F.2d 435, 438, certiorari denied 1949, 337 U.S. 924, 69 S.Ct. 1168, 69 S.Ct. 1171, 93 L.Ed. 1732, and Old Point Fish Company, Inc. v. Haywood, 4 Cir., 1940, 109 F.2d 703, 705 for the proposition that generally maritime liens cannot be acquired while a vessel is in custodia legis. The statement of account offered into evidence by Mr. Hughes showed that after the original libeling of the Seathunder additional charges of $865.09 had been incurred. However, a check for $500 was sent to intervening libelant on April 11, 1958 with an accompanying letter stating in part that the sum of $500 was enclosed "in payment of current stores as ordered by the Master and on account of April stores only." In addition, on May 19, 1958, a credit of $550 was reflected in the statement of account for manila line not used and returned to Mr. Hughes. The law presumes in the absence of proof to the contrary that a creditor having both a secured claim and an unsecured claim intends to allot any part payment made to the unsecured debt. The Home, D.C.W.D.Wash.1946, 65 F. Supp. 94, 95; Field v. Holland, 1810, 6 Cranch 8, 28, 10 U.S. 8, 28, 3 L.Ed. 136; A.L.I. Restatement, Contracts, section 394(1) (b) (ii), p. 743, illustration 5, p. 746. Under this rule the $500 payment was expressly allocated and the $550 credit presumably was intended to be allocated to any supplies ordered after March 27, 1958 and, therefore, the court finds as a fact and concludes as a matter of law that the balance due of $992.08 (of the original bill amounting to $2,042.08) was for stores ordered and billed prior to the original libeling of the vessel and at a time when she was not in the custody of the Marshal.

█ Mr. Hughes made no inquiry as to the ability of the vessel to be bound for the supplies furnished. Again the question before the court is does section 973 of Title 46 prevent the

intervening libelant from asserting a maritime lien and again, as in the case of each of the other intervening libelants, this intervening libelant takes a different tack to avoid the statutory duty of inquiry placed upon him. The theory is advanced that the members of the crew of the Seathunder would have had a maritime lien if they were not furnished with proper and adequate food, and that as Mr. Hughes provided such food he should be subrogated to what at best could be characterized as an inchoate lien of the crew and allowed a lien in this case. In support of his argument intervening libelant referred to sections 665 and 713 of Title 46 U.S.C.A. Section 713 sets forth the articles to be signed by seamen, which articles contain a scale of provisions to be furnished to the crew. Section 665 provides that if, during a voyage, the allowance of provisions as prescribed by section 713 is reduced or of bad quality the seamen shall receive certain additional sums recoverable as wages by way of compensation for such reduction in or bad quality of food. The crew is entitled to bring a libel in rem to recover the penalties set forth in section 665 (The Mary C. Hale, D.C.S.D.N.Y. 1904, 132 F. 800; Billings v. Bausback, 9 Cir., 1912, 200 F. 523). Assuming without deciding that the above mentioned statutes would be applicable to foreign seamen on a foreign vessel, the statutes are not applicable under the circumstances of the instant case for at least two reasons. First, no claim was ever made by any member of the Seathunder that the food was insufficient or of poor quality and, therefore, there is no lien to which Mr. Hughes could be subrogated. If the members of the crew had claimed that the food was insufficient or poor and the master had obtained provisions from Mr. Hughes to prevent the filing of a libel, or if a libel had in fact been filed but withdrawn as the result of food furnished by Mr. Hughes, the situation might be different. While it is true that Mr. Hughes is not claiming to have made an advance to discharge valid existing liens, such a theory of recovery is analogous to the theory upon which he now seeks to recover. Thus the court considers that his claim would fail by analogy for the reasons set forth in The Princess, D.C.E.D.Pa.1923, 291 F. 89, where it is stated at page 91:

"* * * There is insufficient evidence to establish that the funds advanced were used to discharge valid existing maritime liens. While it was testified that Wry exhibited receipts to the libelant's officers, there is no sufficient identification of lien claims claimed to have been paid, either as to lien claimant, character of lien, or amount thereof, to which each advance was applied.

"While a maritime lien for advances to discharge valid liens created in a home port may be sustained, yet it is essential that the existence and identity of the liens and fact that the money was actually used for the purpose of discharging them be established by competent evidence."

See also: The Englewood, D.C.E.D.N.Y. 1932, 57 F.2d 319, 320. But, secondly, and most importantly, the Maritime Lien Act controls. There can be no question, and proctors are agreed, that the word "necessaries" includes food for the crew (See: The Majestic II, D.C.S.D.Fla.1922, 285 F. 91, 93; The Penn, 3 Cir., 1921, 273 F. 990, 991). If food comes within the meaning of the word "necessaries" as used in section 971 of the Act, a fortiori food must be included within the meaning of the same word "necessaries" contained in section 973 of the Act; which section places the duty of inquiry upon one in Mr. Hughes' position. He, having failed to make any inquiry, must bear the loss and accordingly his claim to a maritime lien fails.

The foregoing opinion embodies the findings of fact and conclusions of law required by Admiralty Rule No. 46½ of Title 28 U.S.C.A. Should proctors desire additional findings they may submit requests therefor to the court for its consideration.